663 P.2d 1111

STATE of Idaho, Plaintiff-Respondent,

v.

David Allen OSBORN,
Defendant-Appellant.

No. 14333.

Supreme Court of Idaho.

May 26, 1983.

Gaylen L. Box, Pocatello, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Boise, for plaintiff-respondent.

HUNTLEY, Justice.

The procedural background and facts of this case are contained in this court's decision in *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981). In *Osborn I* this court reviewed the imposition of the death penalty on Osborn for first degree murder and remanded the case for resentencing in conformance with its opinion. Resentencing was held on August 25, 1981. At that time appellant's request for a de novo resentencing hearing was denied. After considering argument of counsel, the court sentenced the defendant to a fixed life term of imprisonment. This appeal followed. The sole issue on appeal is whether the trial court abused its discretion in imposing a fixed life term.

Because of the gravity of the sentence imposed, a brief review of the facts is appropriate.

On October 31, 1978, the partially clothed body of Christine Carl was found along a road on the outskirts of Pocatello. She had been shot three times in the head, once in the shoulder, and once in the abdomen. Her face showed extensive bruising on the left side, and her nose was fractured. The pathologist stated that the large amount of blood loss would indicate that the victim's nose had been broken prior to her being shot. The pathologist believed the bullet wound behind the victim's ear was a close contact wound while the other head wounds were probably distance wounds, although he stated it was possible that they could have been incurred within eighteen inches of the firearm. He also stated that the beating could have occurred prior to the shooting, but noted that this was conjectural, as the same bruising could have occurred had the beating occurred simultaneously with the shooting.

The police discovered a revolver at the house where Osborn was arrested. An F.B.I. report stated that due to similarity of rifling marks, the gun could have been the murder weapon. The report also stated that since the gun had some missing parts, the cylinder of the gun had to be manually rotated before the following round could be fired. A witness testified that in October 1978 he sold Osborn a revolver of the type discovered at the house where Osborn was arrested. He noted that at the time of the sale a part was missing which made it necessary to rotate the cylinder by hand between shots to position the next live round.

At the resentencing hearing the trial court relied on the record created in the *Osborn I* aggravation/mitigation hearing. As a result of that hearing the court found the following two aggravating circumstances existed beyond a reasonable doubt:

(1) "that the murder was especially heinous, atrocious or cruel, manifesting exceptional depravity," and

(2) "that by the murder and the circumstances surrounding its commission, the de-fendant exhibited utter disregard for human life."

The court also found, but only by a preponderance of the evidence, the aggravating circumstance that appellant, "by prior conduct and his conduct in the commission of the murder, has exhibited a propensity to commit murder and will probably constitute a continuing threat to society."

Sentencing is committed to the discretion of the trial court and defendant has the burden of showing an abuse of that discretion. *State v. Olsen,* 103 Idaho 278, 647 P.2d 734 (1982); *State v. Delin,* 102 Idaho 151, 627 P.2d 330 (1981). A sentence fixed within the limits prescribed by the statute will ordinarily not be considered an abuse of discretion by the trial court. *State v. Nice,* 103 Idaho 89, 645 P.2d 323 (1982); *State v. Dunn,* 91 Idaho 870, 434 P.2d 88 (1967). The penalty for first degree murder is death or imprisonment for life. I.C. § 18-4004. The sentence imposed in this case is therefore within the statutory limits proscribed by the legislature.

Reasonableness is a fundamental requirement in sentencing and this court must examine the circumstances of each case to determine whether the punishment imposed is excessive. *State v. Nice, supra.*

An examination of the record in this case does not indicate that the trial court abused its discretion.

Appellant urges us to adopt the reasoning of the court of appeals in *State v. Tisdale,* 103 Idaho 836, 654 P.2d 1389 (1982), which requires district courts to set forth in writing the reasons for imposing a particular sentence. Although the trial court failed to make specific statements regarding its reasons for imposing the sentence, a review of the record adequately reflects his reasoning.

We note that while the setting forth of reasons for the imposition of a particular sentence would be helpful, and is encouraged, it is not mandatory. To the extent that *Tisdale* is inconsistent with the views expressed herein, it is overruled.

■ Appellant contends that the trial court abused its discretion in failing to make written findings regarding mitigating factors considered. Although the trial court was required to "set forth in writing *any mitigating factors considered*" I.C. § 19–2515(d) (emphasis added), the trial court in this case simply stated that there were not mitigating factors present. In so doing, the trial court did not comply with the requirement of I.C. § 19–2515(d) or with this court's express mandate in *Osborn I, supra.* We do not approve of the actions of the trial court because the findings mandated by the statute are necessary to provide a meaningful basis for distinguishing cases in which the death penalty is imposed from those in which it is not. Although the trial court should have set forth in writing the factors considered in mitigation in this case, in view of our holding that the trial court did not abuse its discretion in sentencing the defendant to a determinate life term and the fact that the death sentence was not imposed in this case, no reversible error occurred.

The sentence imposed by the district court is affirmed.

BAKES, J., concurs.

DONALDSON, C.J., and SHEPARD, J., concur in the result.

BISTLINE, Justice, concurring and dissenting.

Although there is much contained in the Court's opinion with which I agree, there is some with which I cannot agree. Moreover, there is more about this case needful of being said which the Court's opinion does not reach. I apprehend that in needlessly overruling *State v. Tisdale,* 103 Idaho 836, 654 P.2d 1389, just handed down by the Court of Appeals in December of 1982, this Court may be doing a disservice to that court, and to the district courts as well.

### I.

A first consideration is that since the Court of Appeals became operative sixteen months ago it has become readily apparent, as was anticipated, that that court would be far more heavily involved in sentence review than this Court. Sentence review is a heavy responsibility, and it has been suggested that this Court has not always lived up to its responsibility in that field of appellate review. *See State v. Adams,* 99 Idaho 75, 577 P.2d 1123 (1978) (Bistline, J., dissenting). The Court of Appeals in fulfilling its function has determined that it would be helpful to have before it the facts and reasons which motivated the district court to reach a sentencing determination. In deference to that court's views as to how it will conduct its appellate review, with which I agree, I am not persuaded to interfere. Moreover, in the area of civil appeals this Court has made it clear that while one of the reasons for requiring court-made findings of fact and conclusions of law is to aid appellate review, another equally valid reason is so that the district judge can evaluate the soundness and reasonability of his own decision as he makes it. In *Compton v. Gilmore,* 98 Idaho 190, 560 P.2d 861 (1977), we quoted with approval the words of Judge Maris, speaking for the Third Circuit Court of Appeals, whose language was:

> " 'The purpose of that rule is to require the trial judge to formulate and articulate his findings of fact and conclusions of law in the course of his consideration and determination of the case and as a part of his decision making process, so that he himself may be satisfied that he has dealt fully and properly with all the issues in the case before he decides it and so that the parties involved and this court on appeal may be fully informed as to the bases of his decision when it is made.' "

98 Idaho at 194, 560 P.2d at 865.

### II.

Although the appellant's brief states the issue as an alleged abuse of discretion, the relief sought on appeal is that we reduce a fixed life sentence to an indeterminate life sentence, which it is said that we should do by taking into account the mitigating factors which appear in the record. The appellant most specifically and emphatically

made it clear that he is not—in the language of his brief—"requesting that this Court remand his case for rehearing where the potential for another death penalty is a factor." However, his death penalty worries may not be justified in view of *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (May, 1981), which is suggestive that on a third sentencing hearing the defendant, having once been sentenced to a life term, perhaps could not be resentenced to death. Both the state and defendant were not accorded the sentencing hearing which this Court directed in *Osborn I,* 102 Idaho 405, 631 P.2d 187 (1981), and which statutory law mandates where a defendant stands convicted of first degree murder. A distinction, and apparently one within the perception of defendant's counsel, is that even though the state did not appeal, it nonetheless has not had the requisite opportunity to prove aggravating circumstances justifying the imposition of the death penalty. On the other hand, the state did not choose to appeal and challenge the type of hearing which the trial court conducted on remand—from which acquiescence it can be said that the state would be precluded from later, on defendant's successful appeal gaining a resentencing, demanding the death sentence. At the time of the second sentencing hearing, the parties very likely did not have the benefit of *Bullington* other than by the happenstance of coming across the slip opinion. Had counsel for defendant had the benefit of the *Bullington* decision when he wrote his brief, it is doubted that he would have anticipatorily turned away a third sentencing.

*Osborn I,* 102 Idaho 405, 631 P.2d 187 (July 1981), reversed the death sentence which had been imposed, and "remanded for resentencing in accordance with this opinion," 102 Idaho at 419, 631 P.2d at 201. On that same page the district court was directed to "specifically set forth the facts and reasoning underlying the finding, if any, that a statutory aggravating circumstance exists." The Court's opinion, as to mitigating factors, stated this on page 415 of 102 Idaho, found at page 197 of 631 P.2d:

"On review, if the mandates of I.C. § 19–2515(d) are met, we can determine whether the lower court overlooked or ignored any raised mitigating factors, whether the evidence supports the aggravating factors found, and finally whether the court has properly weighed all factors. If the findings of the lower court are not set forth with reasonable exactitude, this court would be forced to make its review on an inadequate record, and could not fulfill the function of 'meaningful appellate review' demanded by the decisions of the United States Supreme Court. *We hold that the legislative requirement that all mitigating factors considered be set forth must be met.*" (Emphasis added.)

This Court on the same page paused to give guidance, and reaffirmed the views it announced thirty years ago:

"In previously discussing the court mitigating circumstances concept under our sentencing provisions, this court stated:

"'It may be open to debate as to whether the "circumstances" mentioned in § 19–2515, I.C., refer particularly to circumstances surrounding the commission of the crime and tending to aggravate or mitigate the character of the conduct involved, or whether such circumstances include also the convict, himself, as an individual, which would include his background, his age, upbringing and environment or any other matter appropriate to a determination of the degree of culpability. *We think that the statute should be given the broader interpretation, particularly in a capital case.*' *State v. Owen,* 73 Idaho 394, 403, 253 P.2d 203, 207–208. (1953), *overruled on other grounds, State v. Shepherd,* 94 Idaho 227, 486 P.2d 82 (1971).

Such is still our feeling." *State v. Osborn,* 102 Idaho at 415, 631 P.2d at 197. (Emphasis added.)

Notwithstanding this Court's mandatory directions, no such second resentencing hearing was had. As stated in the opinion which the Court delivers today, ". . . appel-

lant's request for a de novo resentencing hearing was denied ... the court sentenced the appellant to a fixed term of life imprisonment." Appellant's brief argues that "The court, in refusing to grant a de novo hearing, deprived the appellant of the ability to submit additional evidence on his behalf relating to his potential for rehabilitation." He also points to the Court's conclusion in *Osborn I,* n. 5, which declared "... any arguable impact of such substance abuse is a proper consideration in mitigation of punishment...,"[1] adding that there are, in addition to intoxication at the time of the offense, six other factors which are found to have been presented at the first sentencing hearing, according to our record on appeal in *Osborn I:*

"The appellant had no adult conviction record of criminal violence against other persons. (Tr. p. 56, 1. 4)

"The appellant had witnessed his father being killed by his brother while his father was beating his mother.

"The appellant suffered from a long history of polydrug abuse, and he stated that he had been ingesting large amounts of alcohol, heroin, methaqualone and LSD on the night that Chris Carl died. (Tr. pp. 56–57, 11. 23–25 & 1)

"There were indications that the appellant was under the influence of drugs and alcohol at the time of the homicide. (Tr. p. 57, 11. 16–18)

"The psychological problems the appellant experienced as a child carried over into his adult life and caused him to react as he did on the night of the homicide. (Tr. p. 58, 11. 9–12; p. 75, 11. 12–25; p. 76, 11. 1–12)

"The deceased was a victim of multiple gunshot wounds, any one of three would have caused death instantaneously, thus making the act arguably one of passion rather than cool and calculated action. (Tr. p. 78, 11. 9–19)"

Appellant's brief goes on to remind us of that which the Court said in *Osborn I*: "I.C. 19–2515 requires that in any capital case, the court set forth in writing the mitigating factors considered." The trial court refused to do so. This was error, not only insofar as this case is concerned, but works against one of the principal avowed purposes of the 1977 Capital Punishment Act, now codified and I.C. § 19–2515(d) and I.C. § 19–2827(e). *Had* the state appealed the trial court's refusal, this Court would have had to hold that the sentencing was per se not in compliance with the requirements of the law:

"We feel the requirement of written and detailed findings serves a dual purpose. Initially it focuses the attention of the sentencing court upon all the information before it and requires a thorough and reasoned analysis of all relevant factors. This helps assure that the imposition of the sentence of death is reasoned and objective as constitutionally required. It also serves the purpose, as noted by the Florida Supreme Court, of making the process for imposing death rationally reviewable."

*Osborn I,* 102 Idaho at 414–15, 631 P.2d at 196–97.

An important factor which must be kept in mind is that over and above the vital interests of the particular defendant convicted of first degree murder is the goal of uniformity. The present statutory scheme absolutely requires a sentencing hearing whenever the death penalty may be imposed. I.C. § 19–2515(c). The language is not capable of being said ambiguous or equivocal. The outcome of that hearing is limited to two alternatives: "... any per-

---

1. For facility, that footnote to the Court's opinion, which opinion I did not join, reads in full:

"5. While the ingestion of drugs or alcohol by appellant on the evening of the offense is not sufficient in itself to raise a defense to the crime, *it is our conclusion that any arguable impact of such substance abuse is a proper consideration in mitigation of punishment upon sentencing.* Such appears to be the effect of I.C. § 18–116. See also *State v. Gomez,* 94 Idaho 323, 325, 487 P.2d 686 (1971); *State v. Snowden,* 79 Idaho 266, 271, 313 P.2d 706 (1957). See generally, Liebman and Shepard, 'Guiding Capital Sentencing Discretion Beyond the "Boilerplate": Mental Disorder as a Mitigating Factor,' 66 Georgetown Law Journal 757 (1978)." (Emphasis added.)

son guilty of murder of the first degree *shall* be punished by death or by imprisonment for life." I.C. § 18–4004. If the Court finds a statutory aggravating circumstance, the law is inflexible that the death penalty "shall" be imposed, unless, and only unless, the Court finds that mitigating circumstances outweigh any aggravating circumstance and make imposition of death unjust. I.C. § 19–2515(b). Against this statutory backdrop the state solicitor general in his brief filed on behalf of the state urges upon us that the provisions of I.C. § 19–2515(d) requiring written findings of any aggravating circumstances and written mitigating factors considered, "is an inquiry limited to capital cases." State's brief, p. 15. Unless I incorrectly comprehend this contention, which is very much doubted, it is that all of the requirements for written findings of "statutory aggravating circumstances found" and "mitigating factors considered" simply fly out the window once the trial court reaches a beforehand determination that there will be no imposition of a death penalty. More simply stated, if a court makes that conclusion initially, I see the attorney general urging upon us that it need not conduct the sentencing hearing directed by law; hence it is said that there was no error in not following either the law or complying with this Court's directions on remand. I am unable to subscribe to this rationale but am rather of a strong belief that statutory procedures must be complied with and without equivocation or backsliding. The state's position is not at all tenable. In attempting to uphold the district judge's sentencing—as complained of on appeal by the defendant, it strikes a hard blow at the very heart of the scheme which it sponsored. *See State v. Creech II,* Idaho, No. 14480, opinion released May 23, 1983, Justice Huntley dissenting.

This Court in its majority opinion in *Osborn I* instructed the lower courts of the state as to this Court's perception of clear unequivocal statutory language. Ordinarily a mandate to a lower court will be followed, and where not followed, the appellate court's supervisory or review powers are brought into play. Osborn should have had the second sentencing hearing as required by the directions of this Court, and that sentencing hearing should have been conducted as the law requires. The result achieved in this case is just exactly the arbitrary result which death sentence procedures are designed to avoid. If I correctly understand the solicitor general's contention, then I do not understand the reasoning by which he suggests that the statutory law, I.C. § 19–2515(d), "has no applicability to cases in which the defendant was not sentenced to death." Yet, at oral argument in *State v. Creech,* Idaho, No. 14480, we were informed that the solicitor general authored the 1977 Death Penalty Act. I.C. § 19–2515 is part of that law. It is inescapable that Osborn's second sentencing did not comply therewith.

In another first degree murder case which came before us the trial court also did not impose the death penalty. Nonetheless, as the law requires, the death penalty was a possible sentence, a hearing was had, and the trial court made the written findings required. They are part of this Court's records and serve to guide us in considering future death penalty cases—as contemplated by I.C. § 19–2827(c). In that case, *State v. LePage,* 102 Idaho 387, 630 P.2d 674 (1981), the trial court, the Honorable Arnold T. Beebe, entered the requisite written findings, wherein he first reviewed statutory law. That which he wrote should be helpful to other district judges, prosecutors and defense counsel who have yet to go through a § 19–2515 inquiry:

"In this case, the Defendant was convicted of wilful, deliberate and premeditated killing of Kurt Cornelison; Murder in the First Degree. The mandated sentences for first degree murder are death or life imprisonment. Imposition of a death sentence is conditioned upon one or more statutorily prescribed aggravating circumstances inhering in the circumstances of the crime and the defendant's characteristics or propensities. If at least one statutory aggravating circumstance is found to exist beyond a reasonable doubt, a death penalty must be imposed, unless mitigating circum-

stances are found to outweigh the gravity of any such aggravating circumstance so as to make unjust imposition of the death penalty.

"The statutory provisions with regard to first degree murder, the alternate penalties provided, and the standards by which the Court is governed in making the determination, represent an effort by the State to align its first degree murder categorization and capital punishment provisions with the constitutional requirements concerning capital punishment announced in various decisions of the United States Supreme Court. Fundamental requirements so announced include a necessary assurance that death sentences will not be arbitrarily and capriciously imposed and that in every case the circumstances of the offense and the character of the defendant are considered.

"References to the recent turmoil caused the Legislatures of the several states by the 1972 decision of the United States Supreme Court, *Furman v. Georgia* [408 U.S. 238, 92 S.Ct. 2726], 33 L.Ed.2d 346, and the high court's subsequent clarifying decisions in *Gregg v. Georgia* [428 U.S. 153, 96 S.Ct. 2909], 49 L.Ed.2d 859, *Profitt v. Florida* [428 U.S. 242, 96 S.Ct. 2960], 49 L.Ed.2d 913, and *Jurek v. Texas* [428 U.S. 262, 96 S.Ct. 2950], 49 L.Ed.2d 929, are helpful in understanding the function of the sentencing authority in considering a death penalty and in understanding the history and meaning of the statutorily prescribed aggravating circumstances, existence of one of which is a condition of imposing a death sentence. The high court has stated that the Eighth Amendment of the Constitution of the United States forbids punishment that is 'excessive' because such punishment involved the unnecessary and wanton infliction of pain or because it is grossly disproportionate to the severity of the crime. The judicial history abovementioned reflects the difficulty the high court had in determining whether or not a death sentence would continue to be permitted, and finally determining it can be permitted only under established and rigid conditions and circumstances. The death penalty has been characterized as unique and irreversible.

"Essentials to be gleaned from the high court's decisions include the proposition that the sentencing authority must be guided by established civilized standards, dedicated to the proposition that the particularized circumstances of the offense involved and the character and record of the offender must be in focus and the standards, the matters of aggravating and mitigating factors, applied.

"A death sentence may not be imposed under the influence of passion, prejudice or other arbitrary factor. It must not be excessive for the particular crime involved or disproportionate for the penalty imposed in similar cases.

## STATUTORY AGGRAVATING CIRCUMSTANCES

"In this case, of the ten prescribed by the Legislature, the State has urged the following three statutory aggravating circumstances are applicable to the case and should be found by the Court to exist beyond a reasonable doubt:

"Standard 5 (I.C. 19–2515) 'The murder was especially heinous, atrocious or cruel, manifesting exceptional depravity'; Standard 6 (I.C. 19–2515) 'By the murder, or circumstances surrounding its commission, the Defendant exhibited utter disregard for human life'; and Standard 8 (I.C. 19–2515) 'The Defendant, by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society.'

"Initially, the meaning and breadth of applicable criteria are viewed.

"Standard 5 is the same as one of Florida's considered by the United States Supreme Court in *Profitt v. Florida* [428 U.S. 242, 96 S.Ct. 2960], 49 L.Ed.2d 913, under Profitt's contention it was vague and so broad that virtually every capital defendant becomes a candidate for the death penalty. Florida received a favorable decision. The Florida court had interpreted 'especially heinous, atrocious, or cruel' as encompass-

ing only 'the conscienceless or pitiless crime which is unnecessarily tortuous to the victim.' Florida thereby recognized a limiting function to the word *especially*: for all wilful, deliberate, and premeditated murder is, in a degree, characterized as heinous, atrocious or cruel. In *Halliwell v. State*, 323 So.2d 557 [Fla.1975] Florida held mutilation of the victim's body after death was not relevant under that aggravating circumstance standard, reasoning the murder was complete upon death.

"The Florida court's interpretation is persuasive in ascribing to the word 'especially' a legislative intent to limit the standard to those murders wherein the victim *while living* sustains at the hand of the perpetrator physical or mental torture or like invasion.

"Standard 6 presents a problem similar to one considered in Standard 5; namely, it is arguable that Standard 6 applies to every wilful, deliberate and premeditated murder. The query is, then, how can there be drawn a distinction as to the degree of disregard for human life exhibited among murders which are perpetrated pursuant to a preconceived specific intent to kill? Is there a valid basis in the suggestion that one who for a longer time, or more elaborately, schemed the killing exhibits utter disregard for human life while the more summary executioner exhibits only ordinary disregard for human life? Or vice versa? It is thought the existence of provocation, albeit short of excusing or justifying the homicide, might be a negative distinguishing factor among possible circumstances that can exist in such crimes.

"Though the State urges only the three enumerated statutory aggravating circumstances as being applicable in this case, all of the statutory aggravating circumstances must be examined for any meaning one might contribute to another. For example, Standard 1 provides for consideration of the death penalty where 'The Defendant was previously convicted of another murder'; Standard 2 provides for consideration of the death penalty where 'At the time the murder was committed, the Defendant also committed another murder'; and Standard

3 provides for consideration of the death penalty where 'The Defendant knowingly created a great risk of death to many persons'. Thus, it can be seen that Standards 1, 2 and 3 should be borne in mind when considering the meaning and breadth of the urged applicable Standards in this case. Standards 1, 2 and 3 are related to exhibition of a propensity to commit murder as is Standard 8. Standards 2 and 3 are related to exhibition of utter disregard for human life as is Standard 6.

"Standard 6 is a vague case by case distinguishing standard—for in all wilful, deliberate and premeditated murders there inheres the subject of the standard—utter disregard for human life of the victim.

"Taking from the considerations in the murder, or the circumstances surrounding its commission, the aspect that at the time of the murder, the Defendant committed another murder (which is covered by Standard 2) and the aspect of whether Defendant knowingly created a great risk of death to many other persons (which is covered by Standard 3) the variances among wilful, deliberate, and premeditated murder as to exhibition of utter disregard for human life are sorely narrowed. Given the premise that in all such crimes there is exhibited disregard for human life, it is difficult to say that in the crime in question there was 'exhibited *utter* disregard for human life.' This finding must be made beyond a reasonable doubt, and I am unable to so find.

"Standard 8 presents a difficult aspect, that of predicting future behavior. 'The fact that such a determination is difficult however, does not mean that it cannot be made' (*Jurek v. Texas* [428 U.S. 262, at 274, 96 S.Ct. 2950, at 2957], 49 L.Ed.2d 929, at 940). The determination to be made is whether beyond a reasonable doubt the Defendant by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society.

"The Legislature, requiring in capital sentence cases the sentencing authority make determination 'beyond a reasonable

doubt', has introduced a somewhat novel burden. Ordinarily, the Court in sentencing criminals is required to use its best judgment but not to the end it acts in terms of beyond a reasonable doubt. Beyond a reasonable doubt is the burden of proof to be applied to past factual matters before there can be had a criminal conviction. As to those standards of aggravating circumstances which involve the crime in question and prior conduct, the finding of the same beyond a reasonable doubt does not present reasoning or other philosophical difficulties.

"Standard 8 involves, inter alia, a finding from prior conduct and conduct in the commission of the murder of exhibition of a propensity to commit murder. This presents no difficulty since we are dealing with accomplished matters; but, Standard 8 further requires a finding that such exhibition of a propensity to commit murder *will probably constitute a continued threat to society.* This latter finding involves fortelling the future, which man can estimate. But to require such a determination to be 'beyond a reasonable doubt' is a mindboggling reasoning process. 'Probably' may mean *practical certainty* or *in all probability*; or *reasonably expected* or *fairly indicated* (Webster's Third International Dictionary).

"Requiring interpretation is the meaning, in the context of the Standard, of 'continuing threat to society.' At first blush, it appears as a simple phrase, selfdefining. The continuity of the Defendant's propensity to murder with the Defendant's life, is the key (See: *Jurek v. Texas,* Op.Cit. [428 U.S. 262, at 272, 96 S.Ct. 2950, at 2956] at 938–939). Is it permanent?

"This interpretation is derived—reasoning that, aside the purposes that sustain the death penalty, i.e., retribution and public deterrence (See: Dissenting Opinion of Justice Marshall, *Gregg v. Georgia,* supra) there remains the purpose of deterrent to the murderer. Capital punishment inflicted on a wrongdoer is the ultimate deterrent to him. Standard 8 is believed to advance the proposition that one who in all probability will always constitute a threat to again murder shall die.

"Presented is a crime of unprovoked, senseless murder, exhibiting beyond a reasonable doubt a propensity to commit murder. Absent is evidence of prior violent crimes by this 23 year old defendant. The Court is unable to find beyond a reasonable doubt that the propensity is commensurate with Defendant's lifetime—unchangeable. The fangs of malice may yet be blunted within the Defendant's lifetime.

"The Court finding none of the aggravating circumstances exist beyond a reasonable doubt, the finding of one of which is a condition to a death sentence, Orders that arraignment for final sentencing proceed accordingly and forthwith for imposition of other than death penalty.

"DATED this 24th day of April, 1978.
ARNOLD T. BEEBE, District Judge."

In another recent case where there was a guilty plea to first degree murder, committed during perpetration of felonious burglary and robbery, *State v. Sherman,* Bonner County Case No. 42745–F, the district judge, after acknowledging that the conviction under the law authorizes the imposition of the death penalty, "entered the required aggravation-mitigation findings, notwithstanding that the prosecutor believed himself entitled to waive the death penalty:

"1. CONVICTION—The Defendant while represented by Nicholas Lamanna, Attorney at Priest River, Idaho, was found guilty of the offense of First Degree Murder pursuant to a plea of guilty.

"2. PRE–SENTENCE REPORT— That a pre-sentence was ordered by the Court and a copy delivered to the Defendant and his counsel at least seven (7) days prior to the Sentencing Hearing pursuant to *Section 19–2515, Idaho Code,* and the *Idaho Criminal Rules.*

"3. SENTENCING HEARING—That a Sentencing Hearing was held on May 14th, 1982, pursuant to notice to counsel for the Defendant; and that at such hearing, in the presence of the Defendant, the Court heard relevant evidence in aggravation and mitigation of the of-

fense, arguments of counsel and testimony from the Defendant.

"4. FACTS AND ARGUMENT FOUND IN MITIGATION—

a) State of Idaho does not seek the death penalty.

b) The Defendant is 18 years of age.

c) The Defendant was under the influence of LSD and alcohol at the time of committing the crime.

d) The Defendant has no other felony arrests except for being arrested for stealing from his parents.

e) The Defendant expressed no intent to kill Harold Marley, but did intend to shoot him in the leg, if Harold Marley resisted the robbery.

f) Defendant did not formulate the plan to rob Harold Marley himself, but was led by another more experienced with criminal activity.

"5. FACTS AND ARGUMENT IN AGGRAVATION INCLUDING STATUTORY AGGRAVATING CIRCUMSTANCES

a) The murder of Harold Marley was committed in the perpetration of a felony pursuant to *Idaho Code 18–4003(d),* that is robbery and burglary in the nighttime.

b) That the robbery and burglary was a planned robbery and burglary with the possession of a firearm.

c) The Defendant exhibited utter disregard for human life by exhibiting a gun in the presence of Harold Marley.

"6. REASONS WHY DEATH PENALTY WAS NOT IMPOSED—

The death penalty was not imposed because the State does not seek the death penalty and the mitigating circumstances outweigh any aggravating circumstances, so as to make it unjust to impose the death penalty in considering, especially the age of the Defendant.

## CONCLUSION

"It is the conclusion of the Court that the death penalty should not be imposed on the Defendant for the crime of First Degree Murder, but that the Defendant should be confined into the custody of the State Board of Correction to be placed in the State Penitentiary for the balance of his life."

It seems from Judge Cogswell's REASONS that he is at least somewhat in agreement with the prosecutor's belief that he had the option to seek or waive the death penalty, although there is also the statement that "the mitigating circumstances outweigh any aggravating circumstances . . ." My own present view is threefold: First, I do not think that the prosecuting attorney's decision to not seek the death penalty is a mitigating factor. On the contrary, just as the judge has the duty to convene a sentencing hearing, the prosecutor has the duty to present such aggravating circumstance evidence of which he has knowledge, and the sentencing authority—not the prosecutor—will decide the penalty to be properly imposed under the procedures statutorily delineated.

Secondly, the whole scheme of rational imposition of the death penalty throughout the length and breadth of the state is defeated if the statutory procedures are not strictly followed. On automatic review, unlike on appeal where the Court often sees as untouchable error below which was not objected to, there will not in my view be any waiver. In that respect I differ from my brethren who in *Osborn I* were not disturbed by the fact that the district judge did not require live testimony from witnesses.

Thirdly, there is a defect in I.C. § 19–2827(g) wherein and whereunder it is only required that "The supreme court shall collect and preserve the records of all cases in which the penalty of death was imposed from and including the year 1975."

Collecting such records is not a difficult task, because of the automatic review provisions of I.C. § 19–2827(a). Preservation is also no problem, because the Court does keep one copy of all appellate review proceedings. My own conclusion is that the drafter had in mind a separate collection of death penalty findings and conclusions in

all cases, readily available on request to district courts, prosecutors, and defense counsel. Such a collection, which we do not presently maintain as such, will indeed be a helpful tool, but I see it as virtually meaningless unless the collection includes *all* dispositions made following the convening of *all* sentencing hearings held following a conviction of first degree murder. Only in this manner will this Court in making its review be able to determine "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." I.C. § 19–2827(c)(3).[2] Only in this manner will sentencing authorities have established guidelines as to the statewide norm in imposing the penalty for murder in the first degree. Only in this manner can prosecuting attorneys and defense attorneys be adequately informed as to the pulse of Idaho's people—from among whom come the jurors who decide guilt or innocence, and who constitutionally should even now be determining the sentence to be imposed. When we have provided for a proper collection, and when we have required jury sentencing—both of which are within the Court's authority to provide for—thus putting a saving gloss upon the entire procedure—the entire citizenry may profit from a sentencing procedure which is constitutionally sound.

Returning to Osborn's appeal, and giving consideration to the findings in *LePage* and in *Sherman,* it is not unlikely that a sentencing authority, if proceeding under the statutory requirements, would be influenced by Judge Beebe's evaluation of *LePage* who was removed from society for 25 years, and not put to death because "The fangs of malice may yet be blunted within the Defendant's lifetime." Nor is it unlikely that equally influential would be Judge Cogswell's evaluation of the defendant Sherman who, as with Osborn, was "under the influence of LSD and alcohol at the time of committing the crime." Undoubtedly there have been other first degree murder convictions of which the Court has

not been made aware, and the resolution of which would be a proper concern for sentencing authorities in the first place and this Court on review. Suffice it to say, it is not wholly improbable that Osborn on a third sentencing might be found entitled to the same punishment handed to LePage, or that meted out to Sherman. I would reverse for such a hearing, and am of the opinion that it was clearly error for the trial court to not have conducted a hearing as directed by the majority opinion (even though I did not join that opinion), and as required by law.

The Court in today's opinion remains oblivious to the fact that Judge Oliver denied such a hearing upon being led into error by the prosecutor, notwithstanding defense counsel's specific request for that which belongs to such a defendant even without a request:

"THE COURT: Mr. Box, if this Court were to order a de novo hearing, what in the form of oral testimony would you intend to put on?

"MR. BOX: Your Honor, with respect to the period of time that would be prior to June 29th, 1979, the date that sentence was imposed herein, I would have no witnesses. There are no witnesses that I would call that were in existence at that time, or that were not discoverable. In fact, my investigation has revealed that no witnesses which I will call would be in addition to the testimony of the witnesses relied upon at the time of the sentencing.

"With respect to the period of time after the Court imposed the sentence in this matter, that being a period of time after June 29th, 1979, I do have additional witnesses which I would intend to call to have testify. Those witnesses, your Honor, would testify as to matters in mitigation which arose or were determined after June 29th, 1979, and they would include supervisors and guards at the Idaho State Penitentiary which are familiar with Mr. Osborn's conduct and

2. The tenor of the statute is such that I do not hesitate to express a belief that the drafter

thereof *intended* the collection to include all dispositions of first degree murder convictions.

attitude while there. They would include the chaplain at the penitentiary, and other religious officials, who could testify as to Mr. Osborn's interest and participation in religious programs.

"And they would also include statements from and testimony from counselors and supervisors at the Marion, Illinois Federal Penitentiary, which is where David stayed for a short period of time during the time the riot was going on—while the penitentiary was being rebuilt.

"THE COURT: Do you wish to be heard on that?

"MR. PINCOCK: Yes, your Honor, if it please the Court. And counsel. We will oppose any such motion. We think that the terms of the order sent down by the Supreme Court were couched in Idaho Code Section 19–2827. And the precise words of that, and the order comes down in those words in Idaho Code Section 19–2827, where it says that when the Supreme Court, acting pursuant to the authority given them by this section, they may set the sentence aside and remand the case for resentencing by the trial judge *based on the record and arguments of counsel.*

"They make that reference twice, your Honor, in their order. And we think that that is exactly what they intended. And that does not encompass a de novo hearing. It says clearly that it's to be remanded based on the record now before the Court, and arguments of counsel.

"We take the position that that's exactly what that means. . . .

. . . .

"THE COURT: I anticipated your motion in this regard, Mr. Box. The majority opinion of the Supreme Court in this particular matter reversed this ruling because, they contended, this Court did not list mitigating factors that this Court considered, even though the Court, this Court in its opinion, indicated to the Supreme Court that there were no mitigating factors. But, be that as it may, it was remanded for that finding and for resentencing.

"The Supreme Court approved the method that was used by the defense counsel and the prosecutor and this Court at the mitigation/aggravation hearing which relied at that time upon the record of the preliminary hearing. I recognize that Justice Bistline, in his special concurring opinion, said that that was inadequate in this particular case, there should be a de novo hearing.

"I think if you were to convince me that you had someone that was available prior to the time of that mitigation/aggravation hearing to show mitigation on behalf of your defendant, I would consider a de novo hearing. But, based upon your statement that your witnesses would be testifying to after-the-fact incidents, I don't think that is what is contemplated.

"I think that the mitigation/aggravation hearing is based upon the conduct of the defendant up to—prior and up to the time of the mitigation/aggravation hearing. I agree with Mr. Pincock that Section 19–2827(e)(2) requires a resentencing hearing to be based upon the record and the arguments of counsel. And I so rule. Your motion for de novo hearing is denied." R., 6–10.

I do not intimate that the prosecutor intentionally misled the court, but rather that the prosecutor mistook the Court's *Osborn* opinion as a reversal predicated upon an automatic appeal, where, under I.C. § 19–2827(e)(2) the legislature authorizes the court to "Set the sentence aside and remand the case for resentencing by the trial judge based on the record and argument of counsel."—just as Mr. Pincock urged and the judge ruled. But, the reversal was not based upon this Court's automatic review. This was made abundantly clear in the final paragraph:

"In light of the preceding discussion, the sentence of death is reversed. Additionally, being required under I.C. § 19–2827 to undertake an appellate review independent of any alleged errors raised on appeal, we note our awareness of that review, although it is clear the actual statutory review in regard to the present

case awaits resentencing and 'the possibility' that the penalty of death is again imposed."

*State v. Osborn,* 102 Idaho at 419, 631 P.2d at 201. (Emphasis added.)

Footnote 4, 102 Idaho at 412 is compatible with the above paragraph, wherein the Court observed a "given need for a *new* hearing on aggravating and mitigating circumstances." 631 P.2d at 194.

The district judge's ruling was in error. The reversal of *Osborn I* was specifically designated to be as a result of Osborn's appeal, and not a result of the automatic appeal. Hence Osborn was entitled to a hearing, whereat he was entitled to present such as evidence of his character as was available at this second sentencing. Osborn had then been incarcerated for almost three years, and has now been incarcerated going on five years. It is not altogether unlikely that he has become freed of the prior addiction for alcohol and drugs which this Court in its majority opinion found noteworthy of mention in footnote 5, 102 Idaho at 414, 631 P.2d at 196. I submit that where on direct appeal by a defendant his sentence is vacated he is as much at liberty to show his reformation since incarceration as though he had not been sentenced in the first instance. The reports are replete with cases where this has been done. Concededly, it might not be so where the reversal is awarded under the automatic review provisions.

Regarding footnote 5, and remembering that it is the language of a majority of the Supreme Court, it is undoubtedly true that those remarks were an influencing factor when Judge Cogswell in May of 1982 imposed sentence on Sherman, the *Osborn* opinion having been issued in July of 1981. Such being the case, it is difficult for me to see how another district judge would not in a third sentencing of Osborn be somewhat influenced thereby, as well as by any evidence of reformation.

Judge Oliver simply refused to go through a second hearing, and was led to believe that the law precluded a second hearing, if it meant hearing the evidence

anew. Of his reasons for not doing, I am not critical. As stated in the Addendum to my separate *Osborn* opinion,

"Death penalty cases, like juvenile waiver proceedings, see *Dillard v. State,* 101 Idaho 917, 623 P.2d 1294 (1981), are of a unique type where lengthy delays in the judicial process cannot be tolerated, and can lead to claims of prejudice or of cruel and inhuman punishment, especially where death row defendants are kept dangling indefinitely in appellate court processes not knowing whether they eventually will or will not be executed. The district judge performed the function required of him with alacrity, notwithstanding that absolutely no case law guidelines were available as to the interpretation and meaning of the legislative enactment it became his duty to apply."

*State v. Osborn,* 102 Idaho at 433, 631 P.2d at 215.

It has been reported that one of the justices of the Supreme Court of the United States recently expressed a similar view. So, to the extent that Judge Oliver's consideration of the agonizing delay put upon Osborn may be considered as a mitigating factor outweighing all aggravating factors, I am not troubled.

But, insofar as his own agonizing is concerned, I sympathize, and do not believe that the legislature has wisely or constitutionally foisted off onto the shoulders of individual district judges that awesome and agonizing responsibility. For over 110 years the imposition of death sentences in Idaho was a responsibility of twelve people and their selection is a matter wherein the defendant has some say. *See State v. Creech,* Idaho, No. 14480, released May 23, 1983, opinions of Huntley, J., and Bistline, J.

As to Judge Oliver's disenchantment with footnotes 4 and 5 of the Court's opinion, I see considerable merit to his views, set forth in an appendix hereto, and believe this Court upon having been so confronted should be especially quick to resolve the issue as to ingestion of alcohol and drugs being factors in mitigation.

But, at the same time and with what I hope is proper regard for the administration of justice, I will continue to be of the view that there should have been a second sentencing hearing as required by law. Judge Oliver, upon entertaining his stated views of the majority opinion, and his believed proclivities of this Court's membership in the area of capital punishment, was clearly entitled to step aside and assign the second sentencing to another judge.

A third sentencing hearing to be conducted according to law is now in order.

### APPENDIX

. . . .

"THE COURT: Now this resentencing hearing is to be based upon the record and arguments of counsel. And, in mitigation, you may make any statement you wish, sir.

"MR. BOX: Thank you, your Honor. Just briefly, I want to point out to the Court that Mr. Osborn has spent the biggest part of 25 months isolated on death row up until this time.

"During that period of time, every time he heard the tumblers on his cell door turn, he feared it was the warden coming to tell him that he had lost his appeal for his life.

"Your Honor, if Mr. Osborn is sentenced to die again, there's no doubt but what he'll spend another period of time probably equivalent to that on death row waiting for the Supreme Court to make a decision on whether or not he would live or die.

"Your Honor, if capital punishment is not in itself cruel and unusual punishment, I would submit that certainly his endless waiting and the uncertainty through years of waiting in isolation on death row is cruel and unusual punishment.

"I'd ask that the Court not impose the penalty of death at this time, but that it consider an indeterminate term in the Idaho State Penitentiary. Thank you, your Honor.

"THE COURT: Mr. Pincock.

"MR. PINCOCK: Thank you, your Honor. I'd simply like to state to the Court that we have reviewed very carefully the record that is before the Court and the arguments that were made at that time. And we simply would like to reaffirm and rely upon that record that was established, instead of this being heard de novo, and rely and reaffirm again the argument that was made on behalf of the State at that time, your Honor. Thank you.

"THE COURT: Mr. Osborn, do you have any statement that you wish to make on your behalf, sir?

"DEFENDANT OSBORN: Your Honor, I just have a couple words to say. When I was sentenced to death, when you imposed a death penalty on me June 29th of '79, I want to apologize to you. Because I don't know if you can understand the shock I received at the time when I did make an outburst here in your courtroom. I want to apologize for that at this time. That's all I have to say.

"THE COURT: Thank you. Well, I've got to admit I've thought an awful lot about this particular matter since the opinion of the Supreme Court was issued on the 9th day of July. Regardless of my opinion of the merits of that opinion, and regardless of the fact that I've admitted to counsel for both the State and the defendant that I don't understand what was said, what they wanted—regardless of that, I, in reviewing that opinion in this case, and in reviewing opinions that have come down from this same Supreme Court in other cases regarding the death penalty, and I'm making reference to Creech and some of those cases, I'm firmly convinced in my own mind, counsel for the State and counsel for the defendant, that the present makeup of the members of the Supreme Court of the State of Idaho would not affirm a death sentence, I'm satisfied of that, under any circumstances, factual circumstances, that were presented to them.

"I think you can see the handwriting on the wall if you read this opinion real close, if you read footnotes four and five of that particular opinion. In those footnotes, you can see the handwriting on the wall, and I make reference particularly to footnote numbered five.

"The Court—I'm speaking of the Supreme Court—makes a statement as to the effect that ingestion of drugs or alcohol, while not a defense, should be considered in mitigation of punishment. That's said in a footnote, not in the principal opinion.

"In my mind, I always felt those were aggravating circumstances, not a mitigating circumstance, even though self-induced intoxication, whether by drugs or alcohol, went to the question of intent.

"We didn't have the question of intent in this particular case, because the defendant admitted and pled guilty. But they say in that footnote that that should have been considered by me in mitigation. I think in my own mind I questioned if the Supreme Court hadn't granted a license to substance abusers.

"I'm now making reference to footnote numbered four. I think if you'll make a particular note of that, Mr. Pincock, Mr. Box, if you'll read that closely, the Supreme Court infers that if they, at that time, were hearing this matter on review, as provided by the statutes, rather than on appeal, that the court members might disagree with this Court, this Court's finding that certain findings in aggravation were proven beyond a reasonable doubt.

"Now you take those two footnotes and read them together, I'm satisfied that in this case, or in any other case, that the Supreme Court of the State of Idaho would not uphold a death penalty. And, since I'm firmly convinced the sentence of death wouldn't be upheld by our present Supreme Court, I don't intend to agonize myself, as I did prior to the 29th of June, by making findings and conclusions that would support a death sentence.

"Neither do I intend to make Mr. Osborn agonize for another two or three years incommunicado on death row while the Supreme Court would review findings of fact and conclusions which I endorsed for a death sentence, which I am satisfied would not be upheld. And, for this reason, I refuse at this time to follow the mandate of the Supreme Court and make findings in mitigation.

"(To Defendant Osborn) And, instead, you'll stand again, sir. I'm going to resentence you.

"You having entered a plea of guilty to a Prosecuting Attorney's Information charging you with the crime of Murder in the First Degree, again it's the judgment of the Court that you are guilty.

"At this time, you'll be remanded to the custody of the Bannock County sheriff, and you'll be held by him for transportation to the Idaho State Correctional Institution. Upon your arrival there, you'll serve a fixed life term of imprisonment. At this time, you're remanded to the custody of the sheriff in execution of this sentence."

Tr. pp. 7–15.