747 P.2d 710

**STATE of Idaho, Plaintiff-respondent,**

v.

**Bryan Stuart LANKFORD,
Defendant-appellant.**

**Bryan Stuart LANKFORD,
Petitioner-appellant,**

v.

**STATE of Idaho, Respondent.**

**Nos. 15760, 16170.**

Supreme Court of Idaho.

July 29, 1987.

Rehearing Denied Oct. 20, 1987.

Fitzgerald, Sims & Fisher, Lewiston, for appellant. Joan M. Fisher (argued).

Jim Jones, Atty. Gen., Boise, for respondent. Solicitor Gen. Lynn E. Thomas (argued).

BAKES, Justice.

Bryan Lankford was convicted by a jury of two counts of first degree murder for the killings of Robert and Cheryl Bravence. Following the trial, the district court held a sentencing hearing and sentenced the defendant to death. Lankford appeals this conviction and sentence and the district court's denial of his petition for post conviction relief before the same court, which was denied after a hearing. The appeals have been consolidated pursuant to I.C. § 19–2719. This matter is additionally before the Court under the statutory provisions of I.C. § 19–2827 which provides for automatic review of death sentences.

Evidence at trial disclosed that in June, 1983, Lankford was living in Texas on probation for a robbery conviction. Lankford was arrested for a DUI violation. Fearing that this violation of his probation would lead to his imprisonment, he fled the state with his older brother, Mark Lankford, in the latter's car. The pair eventually made their way to Idaho County, where they camped in the forest near Grangeville. They concluded that, because the monthly payments on Mark Lankford's car were delinquent, the police would be searching for it and that they needed to abandon the car to avoid capture. They left the car in the woods covered with brush and set off to steal another car.

The brothers came upon the Bravences' campsite and decided to take the Bravences' van. Bryan Lankford walked into the camp armed with a shotgun and engaged the Bravences in conversation. Subsequently, Mrs. Bravence left the group and went to a nearby creek. At this point, Mark Lankford ran into the campsite and ordered Robert Bravence to kneel down on the ground. While kneeling, Mark then hit Robert Bravence over the head with a nightstick. Cheryl Bravence then came up from the creek, and Mark told her to kneel down on the ground and then hit her over the head with the same nightstick. The Bravences were beaten with such force that their skulls had to be reconstructed by an anthropologist before the cause of death could be scientifically determined.

The brothers loaded the bodies into the van and headed back into the forest. The bodies were removed from the van and concealed under branches and other debris a short distance from where the Lankfords had abandoned their car. Lankford and his brother then took the van and traveled through Oregon and California before abandoning it in Los Angeles. During their flight from the murder scene they purchased accommodations and food with the Bravences' credit card.

After abandoning the van, the brothers returned to Texas where they stayed several weeks with Ray Ralmuto, a friend of

Lankford's. Fearing that the authorities were closing in on them, they fled into a remote and inaccessible area of the state where they were ultimately discovered and captured. Among the items found with the Lankfords was a knife which had belonged to Mr. Bravence.

Although the Bravences' bodies were not found until late September, they had been reported missing and, upon discovering the van, the Los Angeles Police Department conducted a forensic examination of the vehicle. The examination turned up numerous incriminating items, including the Lankfords' fingerprints. The Los Angeles police then turned the investigation over to the Federal Bureau of Investigation.

After his arrest Lankford made numerous confessions regarding the killings, none of which were challenged on direct appeal.[1] These statements included two statements made to Texas law enforcement officers, several statements and a written confession to an FBI agent and, after an aborted suicide attempt, Lankford made another statement to an Idaho County deputy sheriff. After Lankford was extradited to Idaho, he was charged with two counts of first degree murder. An attorney was *appointed* to represent Lankford.

The trial was held in March, 1984. In the process of jury selection, in accord with a stipulation by the parties, the trial court separated from the venire all persons who had heard a significant amount of information about the case in order that the jury could be selected from people who had heard little of the case. Voir dire then took place as to the remaining jurors. No significant difficulty was experienced in selecting the jury.

Lankford's defense theory was that he was only an accessory after the fact. Lankford testified in his own behalf and stated that he was dominated by his older brother who was a violent and dangerous person. He testified that he thought his brother would merely knock out the Bravences, and he had not pointed the shotgun at them upon entering the camp. He also testified that after the murders he was hysterical and remained in the van while his brother hid the bodies in the woods. The jury nevertheless found Lankford guilty of two counts of first degree murder.

Subsequent to conviction and sentencing, Lankford filed a petition seeking post conviction relief and moved to disqualify the district judge from presiding at the post conviction relief hearing on the basis of prejudice. The motion was denied. At the post conviction hearing, Lankford argued that his trial counsel had been ineffective for a number of reasons, including his failure to demand that Lankford be subject to a psychological and physical evaluation. The defendant further argued that the trial court had erred in failing to require trial counsel to be forced to submit to an alcohol evaluation. After a hearing, the court denied post conviction relief.

On appeal to this Court, Lankford raises twenty-two issues. Eight of these issues arose from the trial proceedings; nine of the issues questioned the sentencing procedure; two issues dealt with the post conviction relief proceeding; and three issues relate to this Court's statutorily required automatic review of a death sentence. While this Court has reviewed all twenty-two issues, we have found that some were not raised below and thus were not preserved for appeal. Several issues are closely related, and we have consolidated them. For the reasons set out below, we affirm the judgments and sentences.

## I

### *Direct Appeal Issues*

At the outset we note that the defendant appealing from a criminal conviction bears the burden of demonstrating error in the lower court. *State v. Wallace*, 98 Idaho 318, 563 P.2d 42 (1977). Furthermore, error will not be presumed on appeal but must be affirmatively shown by the appellant, and with limited exceptions error at trial must be properly objected to and pre-

---

1. At the post conviction relief hearing, Lankford claimed he had been denied effective assistance of counsel based on his trial attorney's failure to challenge the admission of these confessions.

served to merit review. *State v. Thomas*, 94 Idaho 430, 489 P.2d 1310 (1971).[2] Keeping in mind the standards of review set by our prior case law, we now turn to the issues.

### A.

Lankford argues that the trial court failed to question jurors regarding the adverse effect of pretrial publicity, and therefore he was denied his constitutional right to a trial by a fair and impartial jury. Lankford acknowledges that no objection was raised below as to the *voir dire* process, and therefore the issue is not properly preserved for appeal, absent fundamental error. *State v. White, supra*. However, Lankford argues nevertheless that the failure to question jurors regarding pretrial publicity amounted to fundamental error.

■ The trial court initially questioned jurors regarding pretrial publicity and, based upon a procedure agreed on in advance by counsel, then eliminated all those who felt that they could not fairly try the case.[3] Thereafter, the trial court conducted a limited *voir dire* examination and the balance of the *voir dire* process was conducted by counsel. Lankford has not established any error, much less fundamental error, in the jury selection process. This Court has ruled that great latitude is to be allowed in examination of veniremen upon *voir dire*. *See State v. Pontier*, 95 Idaho 707, 518 P.2d 969 (1974); *State v. Bitz*, 93

Idaho 239, 460 P.2d 374 (1969). The *voir dire* procedure was established by stipulation of counsel, and there is no indication of any abuse of discretion by the trial court in the manner in which he exercised the *voir dire* examination. Accordingly, the claimed error is without merit.

### B.

■ Next, Lankford asserts that it was a "fundamental error" and a violation of due process for the trial court to allow uniformed sheriff's deputies to sit in the courtroom with him. We disagree. The fact that Lankford was guarded while present at the trial fails to raise the question of fundamental constitutional error. The record demonstrates that Lankford did not appear in prison garb, *State v. Crawford*, 99 Idaho 87, 577 P.2d 1135 (1978); rather, at trial he appeared in a three-piece suit. A sheriff's officer sat behind him. In *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), the United States Supreme Court addressed the issue of whether the presence of four uniformed and armed officers was so inherently prejudicial that the defendant was denied his constitutional right to a fair trial. Writing for the majority, Justice Marshall found that unlike cases which involved a criminal defendant being brought to trial in prison garb the presence of the uniformed troop-

---

**2.** The exception to the general rule is that this Court will review "fundamental error" on appeal even when no adequate objection has been interposed at trial. *State v. White*, 97 Idaho 708, 551 P.2d 1344 (1976), *cert. den.* 429 U.S. 842, 97 S.Ct. 118, 50 L.Ed.2d 111 (1976).

"'Error that is fundamental must be such error as goes to the foundation or basis of the defendant's rights or must go to the foundation of the case or take from the defendant a right which was essential to his defense and which no court could or ought to prevent him to waive. Each case will of necessity, under such a rule, stand on its own merits. Out of facts in each case will arise the law.' *See also State v. Haggard*, 94 Idaho 249, 486 P.2d 260, 262 (1971)." *Smith v. State*, 94 Idaho 469, 475, n. 13, 491 P.2d 733, 739, n. 13 (1971).

**3.** At the beginning of the *voir dire* process, upon the request of both the state and Lankford's

attorneys, the district court judge requested all prospective jurors who "will not be in a position to serve as a result of bias, prejudice or undue influence or any other reason that they may be aware of" to raise their hands. Those veniremen who raised their hands were then sent to the back of the room, and the *voir dire* examination continued without calling those persons.

Although the procedures used by the district judge may not have been common practice, both counsel agreed in advance that the procedure was designed and reasonably calculated to assure a selection of an unbiased jury. Lankford's attorney, the prosecutor and the district court judge were all residents of Idaho County and familiar with the pretrial publicity and the mood in the community. There is simply no error in using a *voir dire* procedure which both counsel agreed was designed to assure the selection of a fair and impartial jury.

694

ers did not prejudice the defendant. Justice Marshall stated:

> "We do not minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial. (Citations omitted.) But we simply cannot find an unacceptable risk of prejudice in the spectacle of four such officers quietly sitting in the first row of the courtroom's spectator section. (Footnote omitted.) Even had the jurors been aware that the deployment of the troopers was not common practice in Rhode Island, we cannot believe that the use of the four troopers tended to brand the respondent in their eyes 'with an unmistakable mark of guilt.'" *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 1347, 89 L.Ed.2d 525 (1986) (citations omitted).

No error resulted from the fact that Lankford was guarded by law enforcement officers during his trial.

### C.

Lankford next makes a broad based and comprehensive attack on the instructions which were presented to the jury. Lankford claims that the jury instructions as a whole misstated the law and were so misleading and confusing that the defendant was denied his right to a fair trial. In addition to claiming the instructions as a whole are erroneous, Lankford also attacks numerous individual instructions. Many of the errors claimed in the instructions were not addressed by objections during the trial and have not been properly preserved for

this appeal. Absent a timely objection to the jury instructions, Lankford's assignments of error with respect thereto are not entitled to consideration on appeal. *State v. Watson*, 99 Idaho 694, 587 P.2d 835 (1978).

■ Where the jury instructions, taken as a whole, correctly state the law and are not inconsistent, but may be reasonably and fairly harmonized, it will be assumed that the jury gave due consideration to the whole charge and was not misled by any isolated portion thereof. *State v. Tope*, 86 Idaho 462, 387 P.2d 888 (1963). After reviewing the record we find that the instructions, either individually or as a whole, were not in error. We will deal specifically with two of Lankford's claims of error.

■ First, Lankford argues that the district court erred when it refused defendant's Proposed Jury Instruction Number 4[4] that asked the jury to render a special verdict on the defendant's intent. The crux of Lankford's claim is that under the United States Constitution a defendant cannot be sentenced to death for felony murder without a finding of an *intent* to kill. However, in Idaho it is the judge and not the jury who makes the determination of whether the death sentence will be imposed. Accordingly, the district court did not err when it refused Lankford's Proposed Instruction No. 4 which attempted to impermissibly shift the trial court's duty to find an intent to kill to the jury.

■ Lankford also argues that Instruction No. 17[5] was improper because it in-

---

**4.** "DEFENDANT'S REQUESTED INSTRUCTION NO. 4

....

"Answer this question only if you find the defendant, Bryan Lankford, guilty of Murder in the first degree.
Do you find, beyond a reasonable doubt that Bryan Lankford himself killed, attempted to kill, or had any intent to kill either of the victims in this case?"

**5.** "INSTRUCTION NO. 17

"'Malice', as aforesaid, may be either express or implied. Malice is express when there is manifested an intention unlawfully to kill a human being. Malice is implied when the killing results from an act involving a high degree of probability that it will result in death, which act

is done for a base, antisocial purpose, and with a wanton disregard for human life by which is meant, an awareness of a duty imposed by law not to commit such acts followed by the commission of the forbidden act despite that awareness, or when the killing is a direct and casual result of the perpetration or attempt to perpetrate a felony inherently dangerous to human life, specifically in this case robbery.
"The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person killed.
"'Aforethought' does not imply deliberation or the lapse of considerable time. It only means that the required mental state must precede rather than follow the act."

structed the jury that "malice is implied when the killing results from an act involving a high degree of probability that it will result in death...." Lankford argues that the instruction relieved the state of proving intent and since the state must prove each essential element of a crime beyond a reasonable doubt the jury instruction was erroneous and in effect diminished the state's burden of proof. We disagree. Contrary to Lankford's assertion, the instruction does not state that killing in perpetration of a robbery is malice *per se.* The instruction *does* advise the jury that malice can be implied in some situations. The United States Supreme Court has stated that:

> "In many cases, the predicate facts conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not *intend* to cause injury. [Citation omitted.] ....
>
> "No one doubts that the trial court could properly have instructed the jury that it could *infer* malice from respondent's conduct. [Citation omitted.] Indeed, in the many cases where there is no direct evidence of intent, that is exactly how intent is established. For purposes of deciding this case, it is enough to recognize that in some cases that inference is overpowering. [Citation omitted.]"

*Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). (Emphasis in original.)

Murder committed during the course of a robbery is, by definition, murder in the first degree. I.C. § 18-4003. Proof that the murder occurred during the commission of a robbery merely is a substitute for specific proof of premeditation on the theory that one who prepares for a robbery by making arrangements to use deadly force is guilty of acts as culpable as, and probably comprising, premeditation. *See* 40 Am. Jur.2d § 72, Felony-murder Generally.

**D.**

Next, Lankford attacks the constitutionality of I.C. § 18-4003(d)—felony mur-

der,[6] arguing that under *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and its progeny the statute violates the 8th amendment prohibition against cruel and unusual punishment and the 14th amendment guarantee of due process by punishing conduct without requiring proof of a mental state. Lankford's argument has been considered by this Court at length in *State v. Windsor,* 110 Idaho 410, 716 P.2d 1182 (1985), and *State v. Paradis,* 106 Idaho 117, 676 P.2d 31 (1984), and we have found the statute to be constitutional and in compliance with *Enmund.*

**II**

*Sentencing Issues*

Imposition of a sentence is within the sound discretion of the trial court and will not be disturbed by a reviewing court in the absence of an abuse of that discretion, and a sentence that is within prescribed limits of the sentencing statute will not ordinarily be considered an abuse of discretion. *State v. Butler,* 95 Idaho 899, 523 P.2d 31 (1974). After reviewing the record, we find that the district court did not abuse its discretion in sentencing Lankford and that there were no significant errors in the sentencing procedure.

**A.**

After Lankford was convicted of two counts of felony murder, but before sentencing, the state entered into an immunity agreement with him under I.C. § 19-1114 in order to obtain his testimony against his brother. Lankford contends that this grant of immunity (which was after the verdict but prior to his sentencing) deprived the district court of the authority to sentence the defendant. We conclude that the district court did not err when it found that the immunity agreement (Defendant's Exhibit # 1) between

---

6. **18-4003. Degrees of murder.—**...

....

"(d) Any murder committed in the perpetration of, or attempt to perpetrate, arson, rape, rob-

bery, burglary, kidnapping or mayhem is murder of the first degree.
...."

the state and Lankford did not immunize Lankford from sentencing for the crimes for which he had already been convicted when the agreement was entered into.

I.C. § 19–1114 states in part that, "If ... the person would have been privileged to withhold the answer given ... that person shall not be prosecuted or subject to penalty ... *on account of any fact or act concerning which ... he answered.*" (Emphasis added.) By its clear wording, the statute does not apply in this case. None of the testimony given by Lankford pursuant to the immunity agreement was used to prosecute or to punish Lankford.[7] Instead of providing retroactive protection, the immunity agreement was prospective in effect and protected Lankford from any other charges that might have been brought pursuant to his use of the Bravences' property.

### B.

◼ Next Lankford argues that the district court erred when it denied his motion for a continuance of the sentencing hearing. The relevant facts show that Lankford made a motion to have co-counsel appointed. The motion was granted and additional counsel was appointed; however, the district court warned Lankford and the newly appointed counsel that granting the motion would not automatically lead the court to grant a motion for continuance. On October 10, 1984, the new co-counsel moved to discharge the trial counsel; this motion was also granted and the district court once again warned Lankford that granting the motion would not automatically lead to a continuance.

"A decision to grant or deny a motion for continuance is vested in the sound discretion of the trial court." *State v. Ward*, 98 Idaho 571, 574, 569 P.2d 916, 919 (1977). Absent a showing that the appellant has shown that his substantial rights have been prejudiced, or that the district court abused its discretion, we will not reverse a denial of a motion for continuance. *See State v. Laws*, 94 Idaho 200, 485 P.2d 144 (1971).

The motion for a continuance was not arbitrarily denied. The record demonstrates that the district court made extensive findings into the information available to Lankford's attorney for sentencing purposes. Lankford's new attorney had adequate information and called numerous witnesses at the sentencing hearing. There was no showing that important witnesses were unavailable due to the denial of the motion. The state was prepared for the scheduled hearing, brought in witnesses, and incurred significant expenses, while no prejudice to Lankford was shown. In *State v. Brown*, 98 Idaho 209, 212, 560 P.2d 880, 883 (1977), we stated that "a defendant may not indefinitely postpone trial or sentencing by continually changing counsel...."

### C.

◼ Lankford contends that the district court erred in imposing the death penalty where the prosecution offered no evi-

---

7. Lankford asserts that the district court judge used the immunized testimony in its findings of fact to support the imposition of the death penalty. However, the record does not support that assertion. While the district court described Lankford's testimony at his brother's motion for new trial in its sentencing memorandum, it was not considered as an aspect of any of the statutory aggravating circumstances found by the court. During the district court's oral discussion of the sentence, the judge stated:

"The defendant has shown no remorse for his offenses. He has not cooperated with authorities after his arrest. He has told authorities that he and his brother had nothing whatsoever to do with the death of the Bravences. He has testified that his brother was alone involved in the murders. He has testified on

October 10, 1984 in the companion case, *State v. Mark Lankford*, Idaho County Case No. 20158, that he called the *Lewiston Tribune* and claimed that it was he alone who murdered the Bravences. This he later denied and offered the explanation which is set forth in the addendum to the presentence investigation report under date of October 3, 1984, to the effect that it was simply part of a plan that would secure freedom for his brother, who could in turn free him."

Although it is true that the district court judge pointed out the conflicting testimony given by Lankford at various times, including the testimony given pursuant to the immunity agreement, there has been no showing that the sentence was based upon the comments quoted above.

dence in support of the statutory aggravating circumstances set forth in I.C. § 19–2515. At sentencing, the prosecutor did not seek the death penalty, and therefore he did not offer any additional evidence at the sentencing hearing. It is Lankford's contention that the evidence produced at trial was not available to the judge for purpose of sentencing, and therefore the district court had no evidence with which to find the statutorily required aggravating circumstances. However, I.C. § 19–2515(c) expressly provides, "Evidence admitted at trial shall be considered and need not be repeated at the sentencing hearing." The evidence that was used at the sentencing hearing by the trial court judge amply supported the trial court's conclusion. The trial court is entrusted with the responsibility for sentencing in Idaho, I.C. § 19–2515(c), (d), (e); *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983), *cert. den.,* 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984), and therefore the district court was not bound by the recommendations of the prosecuting attorney. In *State v. Kohoutek,* 101 Idaho 698, 619 P.2d 1151 (1980), we held that there was no abuse of a district court's discretion when it proposed a sentence different from that recommended by the prosecuting attorney. The district court had sufficient evidence before it and did not abuse its discretionary authority to sentence the defendant.

### D.

■ Next, Lankford contends that the district court erred when it failed to notify the defendant of the possibility of the imposition of the death penalty. After the verdict was rendered, and in preparation for sentencing, the district court ordered the prosecution to give written notice on whether it would seek the death penalty. The prosecution responded that it would not. Lankford argues that the prosecution's written notice negated the statutory notice that he might be sentenced to death. We disagree.

The record reflects that at his arraignment the district court expressly advised Lankford that the death penalty was a possible sentence for the crimes he was charged with. Additionally, the United States Supreme Court has pointed out that the "existence [of a death penalty statute] on the statute books provides fair warning as to the degree of culpability which the state ascribed to the act of murder." *Dobbert v. Florida,* 432 U.S. 282, 298, 97 S.Ct. 2290, 2300, 53 L.Ed.2d 344 (1977). Lankford has not cited us to any authority which supports his position that he was entitled to greater notice than that given by the statutes and by the district court.

### E.

Next, Lankford attacks the constitutionality of Idaho's capital punishment procedure, arguing generally that I.C. § 19–2515 violates the eighth amendment's prohibition on cruel and unusual punishment and the sixth amendment's right to a trial by jury because the statute does not require jury participation in the sentencing procedure. Furthermore, Lankford contends that I.C. § 19–2515(d) is specifically unconstitutional under both Idaho and United States Constitutions because it does not require the district court to limit the testimony at the sentencing hearing to live testimony. Lankford argues that it is essential that a defendant be allowed to cross examine and rebut adverse sentencing evidence because of the possibility that the trial court is prejudiced and that the Idaho statute allows rampant use of hearsay and other inadmissible information.

■ The issue of jury participation has been resolved in Idaho in *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983), and *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981), and approved under the United States Constitution in *McMillan et al. v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986). The issues of hearsay testimony and defendant's right to cross examine or confront adverse testimony has likewise been resolved against appellant's position. *See State v. Osborn, supra.*

### F.

■ Next, Lankford argues that the district court's failure to consider in writ-

ing two mitigating factors which were produced at the sentencing hearing was error that requires remanding for sentencing. The two mitigating factors which Lankford complains were not considered in writing by the district court are (1) that the prosecution recommended a sentence less than the death penalty, and (2) that the defendant had taken and substantially passed two polygraph tests that had been requested by the state. Lankford asserts that the sentencing statute, I.C. § 19–2515, has been given a broad interpretation by the courts with the intent of ensuring that a thorough and reasoned analysis of all relevant factors take place.

The record demonstrates that the district court described the mitigating factors that it considered in sentencing Lankford. Those mitigating factors included all of the factual evidence presented in mitigation by the defendant and the arguments made in connection with them. It is clear from the record that the district court judge complied with the requirements of I.C. § 19–2515.

### III

### *Post Conviction Relief Issues*

After sentencing and conviction, Lankford brought an action for post conviction relief in the district court. After an extended hearing, the district court made findings denying this petition. A denial of post conviction relief will not be disturbed on appeal where there is substantial competent evidence supporting the denial. *State v. Hinkley*, 93 Idaho 872, 477 P.2d 495 (1970). After reviewing the record of the post conviction relief proceeding we find that there was substantial and competent evidence to support the district court's findings.

### A.

Lankford first argues that he was deprived of his constitutional right to effective assistance of counsel. Lankford raises twelve areas where it is claimed his trial attorney failed to provide effective assistance. Lankford argues that his trial attorney failed to: (1) file a motion for change of venue; (2) adequately prepare for and conduct the *voir dire* which would allow the selection of a fair and impartial jury; (3) fully investigate and prepare the factual and legal basis for the defendant's case; (4) file motions to suppress constitutionally infirm statements taken of the defendant; (5) file a motion for psychiatric or psychological evaluation; (6) file a request for discovery; (7) research and raise viable defenses; (8) object to the defendant being compelled to go to trial under heavy guard; (9) request a limiting instruction on the use of prior inconsistent statements; (10) object to irrelevant, immaterial and prejudicial evidence; (11) request a limiting instruction on impeachment by prior felony conviction; (12) object to erroneous instructions. Lankford concludes that these errors and omissions of the trial counsel require a reversal of the defendant's convictions. However, we conclude that the record does not support the allegations.

■ A claim of ineffective assistance of counsel cannot be presumed by an appellate court. *State v. Elisondo*, 97 Idaho 425, 546 P.2d 380 (1976). We have examined an extensive record in which the parties explored in detail the basis for Lankford's allegations through witnesses and affidavits and through direct and cross examination. A review of this record clearly establishes that Lankford was not deprived of the right to effective assistance of counsel. The United States Supreme Court has stated that the test to be applied to a claim of ineffective assistance of counsel is whether counsel's conduct so undermined the proper function of the adversarial process that the trial court cannot be relied on as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Also see Burger v. Kemp*, — U.S. —, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). This issue has been extensively litigated in Idaho. In *Estes v. State*, 111 Idaho 430, 725 P.2d 135 (1986), we summarized the existing law as follows:

"This Court has also addressed the question of what constitutes effective assistance of counsel. In short, a defendant is

entitled to the reasonably competent assistance of an attorney. *State v. Tucker*, 97 Idaho 4, 8, 539 P.2d 556, 560 (1975). *Accord Strickland v. Washington*, 466 U.S. at 686, 104 S.Ct. at 2064. 'A showing that defendant was denied the reasonably competent assistance of counsel is not sufficient by itself to sustain a reversal of the conviction. The defendant, in most cases, must make a showing that the conduct of counsel contributed to the conviction or the sentence imposed.' *State v. Tucker*, 97 Idaho at 4, 539 P.2d at 564 (1975); *see also State v. Tisdel*, 101 Idaho 52, 54, 607 P.2d 1326, 1328 (1980). We have also repeatedly stated that we will not attempt to second-guess strategic and tactical choices made by trial counsel. *State v. Larkin*, 102 Idaho 231, 233, 628 P.2d 1065, 1067–68 (1981); *State v. Tucker*, 97 Idaho at 10, 539 P.2d at 562.

"These standards, articulated by both the United States Supreme Court and this Court, must be used to determine whether Estes received effective assistance of counsel. As the Supreme Court has stated, 'A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct and to evaluate the conduct from counsel's perspective at the time.' *Strickland v. Washington*, 466 U.S. at 689, 104 S.Ct. at 2065. The presumption in evaluating attorney effectiveness is that the attorney is competent and that his actions represent sound trial strategy. A defendant shoulders a difficult burden when he seeks to assert ineffective assistance of counsel." *Estes v. State*, 111

Idaho at 434, 725 P.2d at 139 (footnote omitted).

At the post conviction relief hearing, Lankford's trial counsel testified that the extensive physical evidence, Lankford's numerous admissible confessions, and the verbal testimony which would be produced by the prosecution at trial was sufficient to convict Bryan Lankford of first degree murder. He stated that after evaluating this evidence he determined that Lankford's best opportunity to avoid a first degree murder conviction was to defend on the theory that Lankford was an "accessory after the fact." All of the charges against Lankford's counsel are a direct result of the trial counsel's strategic and tactical choices to defend Lankford on the "accessory after the fact" defense. Because it is not the function of a reviewing court to substitute its judgment or that of a substitute counsel for the strategic and tactical choices of the trial counsel, *State v. Larkin*, 102 Idaho 231, 233, 628 P.2d 1065, 1067–68, Lankford's new counsel must do more than demonstrate that alternative strategies were available which might have been better. In sum, none of the numerous charges made by the defendant against his trial counsel demonstrate that (1) Lankford was denied the reasonably competent assistance of counsel, and (2) that the conduct of his trial counsel contributed to his conviction.

## B.

Next, Lankford claims that the district court erred in denying defendant's motion to disqualify the court for prejudice.[8] Following conviction and sentencing, the defendant moved to disqualify for cause the trial judge from the post conviction relief proceeding pursuant to I.R.C.P. 40(d)(3)[9] and I.C.R. 25(b).[10] Lankford's at-

---

**8.** The record demonstrates that Lankford's counsel made it clear that the motion to disqualify *was for cause* and was not brought under I.C.R. 25(a) permitting peremptory disqualification. (Tr., post conviction relief proceedings, p. 20.) We note that I.C.R. 25(a) is not available to a criminal defendant in a post conviction relief proceeding.

**9.** "**Rule 40(d)(3). Motion for disqualification.** —Any such disqualification for cause shall be made by a motion to disqualify accompanied by

an affidavit of the party or his attorney stating distinctly the grounds upon which disqualification is based and the facts relied upon in support of the motion. Such motion for disqualification for cause must be made not later than 5 days after service of a notice setting the action for trial or pre-trial, and must be made before any contested proceeding in the action has been submitted for decision to the judge sought to be disqualified; provided where a new trial is granted either by the trial court or an appellate

**10.** See note 10 on page 722.

torney filed the affidavit of prejudice and no counter affidavit was filed.[11] The motion was denied. The parties later stipulated to facts which they believed the trial judge could testify to if called as a witness.[12] The stipulation (which was not based on actual testimony) stated that the judge had knowledge that Lankford's trial counsel had been arrested for DUI and that the judge had received a letter from the defendant requesting a new counsel based on allegations of alcohol abuse, and this letter led to the appointment of co-counsel. The stipulation was received into evidence and then defense counsel reargued its motion asserting that because of the stipulation the trial judge was now a material witness in the case and must be disqualified. This motion was also denied.

Lankford argues that the affidavit and the stipulation were legally sufficient to show prejudice and that the case should be remanded with directions that the trial judge disqualify himself and the matter reassigned. In Idaho a judge cannot be disqualified for actual prejudice unless it is shown that the prejudice is directed against the litigant and is of such a nature and character that it would make it impossible for the litigant to get a fair trial. *State v. Waterman*, 36 Idaho 259, 210 P. 208 (1922).

■ Lankford's affidavit claimed bias on the following grounds: (a) that the district court judge presided in the trial that found Lankford guilty of two counts of first degree murder; (b) that the judge had previously ruled on motions for continuance, new trial, alleged ineffective assistance of counsel, and sentencing; (c) that by presiding in the above matters it would be unreasonably difficult for the judge to impartially determine questions of fact raised in the affiant's petition for post conviction relief; (d) that in assessing the death penalty the judge made findings that Lankford is not a credible person; (e) that Lankford is a material witness in the post confiction relief action and because the judge has determined that he is not a credible witness he will not receive an unbiased determination of his credibility; (f) that Lankford had reason to believe that the district court judge may be a material witness to the factual allegations supporting the claim of ineffective assistance of counsel; (g) that at the affiant's sentencing hearing the district court judge elicited testimony to sup-

court such motion may be made by a party not later than 5 days after service of the notice setting the action for re-trial. The presiding judge or magistrate sought to be disqualified shall grant or deny the motion for disqualification upon notice and hearing in the manner prescribed by these rules for motions."

**10.** "Rule 25. **Disqualification of judge.—** . . .
"(b) Disqualification for cause. Any party to an action may disqualify a judge or magistrate from presiding in any action upon any of the following grounds:
"(1) That he is a party, or is interested, in the action or proceeding.
"(2) That he is related to either party by consanguinity or affinity within the third degree, computed according to the rules of law.
"(3) That he has been attorney or counsel for any party in the action or proceeding.
"(4) That he is biased or prejudiced for or against any party or his case in the action.
. . . ."

**11.** The affidavit set forth specific facts demonstrating that the judge was prejudiced because of his prior rulings made in connection with the trial and stated that the judge *might* be a material witness to the allegations of ineffective assistance of counsel.

**12.** The stipulation reads: "Comes now, attorney for Petitioner, Joan Fisher and attorney for Respondent, Henry R. Boomer, do hereby stipulate and agree that if the Honorable George R. Reinhardt was to testify in this matter, he would say the following: One, that prior to attorney W.W. Longeteig's appointment as counsel for Bryan Stuart Lankford in Case No. 20157, Judge George R. Reinhardt believed that W.W. Longeteig had either pled guilty, been arrested, or was convicted of driving under the influence of alcohol on more than one occasion, and based upon that, Reinhardt felt that W.W. Longeteig had a problem with alcohol.

"Two, that on July 28, 1984, George Reinhardt received certain correspondence from Bryan Lankford which is attached hereto—which is not, because we were not putting it in writing, but it was a motion that was before the court, which the court ruled upon and appointed co-counsel. And with reference to the allegations concerning alcohol, and based upon paragraph one that said such allegations could be true and as a consequence thereof, appoint Joan Fisher to be Bryan Lankford's co-counsel in Idaho, County in Case No. 20157."

port the court's findings of fact in a leading manner, and thereby showed his bias and prejudice against Lankford; (h) that the district court judge on his own motion caused testimony favorable to the affiant (results of polygraph examination which showed Lankford to be truthful on material facts) to be stricken and removed from the jury's consideration; (i) that there is extreme community hostility and prejudice toward Lankford in Idaho County and that this community feeling makes it unreasonably difficult for the judge, who is a resident of the community and an elected official, to impartially hear the affiant's petition; (j) that because the judge found the offenses of which Lankford was convicted to be heinous, atrocious, and exhibiting an utter disregard for human life he could not now determine the merits of Lankford's petition in a neutral, detached, dispassionate and impartial manner; (k) because the issues raised in the petition for post conviction relief directly affect the judgment of the district court judge, it is impossible for the trial court to be impartial; (*l*) that the district court judge has attached an emotional commitment to the "correctness" of his initial determination and cannot render an impartial determination on the merits of Lankford's position; and (m) that a trial court having presided at the trial and sentencing cannot reasonably be expected to determine matters raised relating to said conviction and sentence in an impartial manner.

Lankford's allegations of bias do not show any actual prejudice on the part of the judge directed toward Lankford of such a nature and character that it would have made it impossible for Lankford to get a fair post conviction hearing. Many of the grounds listed above, stated separately or concurrently, do nothing more than state facts that simply explain the course of events involved in a criminal trial. The remaining grounds are mere allegations that, because the judge had made prior rulings adverse to Lankford, he was biased. Thus, we reject Lankford's claim that the district court erred in denying his motion to disqualify the judge.

■ Finally, Lankford's allegation that the district court judge had become a *de facto* material witness in the case and was therefore barred from participation in the case is without merit. The record demonstrates that the district court judge was not subpoenaed as a witness and did not testify in the proceedings. A criminal defendant cannot turn the district court judge into a material witness by introducing a stipulation of facts which the parties believe that the judge might testify to if he was in fact called as a witness. Thus, we reject Lankford's claim that the district court judge had become a material witness in the post conviction relief proceeding.

### C.

■ Next, Lankford claims that the district court abused its discretion in the post conviction relief proceeding by denying two of Lankford's motions. First, Lankford moved to have the court order complete psychological and physical examinations conducted on himself. The court denied the motion. Then Lankford made a motion to compel an alcohol evaluation of the trial counsel. The court denied this request also. We find that the district court did not abuse its discretion in denying the motions. The testimony clearly indicates that Lankford's trial counsel made the decision not to move for psychological and physical evaluation of the defendant based on the strategy of claiming that Lankford was not involved in the crime but was only an "accessory after the fact." Such a tactical decision should not be reviewed in hindsight during post conviction relief. We find there was no abuse of discretion when the district court denied this motion.

■ Regarding the motion to compel an alcohol evaluation of Lankford's trial counsel, there is no factual basis in the record for the court to order the alcohol evaluation. Lankford's trial counsel testified that he had not consumed alcohol while working on the case, and nothing in the record refutes this testimony. There is no factual basis in the record for such an unusual demand, and the district court did not abuse its discretion by denying the motion.

## IV

### Automatic Review

Pursuant to I.C. § 19–2827, all death sentences come to this Court on automatic review. The automatic review statute requires the Supreme Court to "consider the punishment as well as any errors enumerated by way of appeal." The statute requires this Court to undertake a three-part analysis to determine:

"(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and

"(2) Whether the evidence supports the judge's finding of a statutory aggravating circumstance from among those enumerated in section 19–2515, Idaho Code, and

"(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." I.C. § 19–2827.

(1) *Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.*

■■■■ Lankford argues that the death penalty was imposed under the influence of passion, prejudice and other arbitrary factors. The basis for Lankford's claim is his assertion that the community where the defendant was tried was outraged by the crime and that it is reasonable to believe that the district court was affected by the community's mood and that this environment led to the arbitrary imposition of the death penalty.

Contrary to Lankford's assertions, there is nothing in the record that indicates that the sentence of death was due to the influence of passion, prejudice or any other arbitrary factors. To the contrary, we find the trial was conducted in an error-free manner by a district court judge who sought every opportunity to provide Lankford with a fair trial. The jury instructions clearly informed the jury of the applicable law and the evidence presented at trial supports the jury's finding of two counts of first degree murder. The district court, after studying the presentence report and conducting an involved sentencing hearing in which the defendant produced witnesses and information favorable to his cause, made findings both in mitigation and in aggravation. In addition, the Court found numerous statutory aggravating circumstances as delineated under I.C. § 19–2515(g).[13] After laying the findings in mitigation and aggravation, the district court set forth extensive rationale for why the death penalty was imposed. This Court can find no error in the procedure followed by the district court in making its findings.

(2) *Whether the evidence supports the judge's finding of a statutory aggravat-*

---

13. **"19–2515. Inquiry into mitigating or aggravating circumstances—Sentence in capital cases—Statutory aggravating circumstances—Judicial findings.—** ...

. . . .

"(g) The following are statutory aggravating circumstances, at least one (1) of which must be found to exist beyond a reasonable doubt before a sentence of death can be imposed:

(1) The defendant was previously convicted of another murder.

(2) At the time the murder was committed the defendant also committed another murder.

(3) The defendant knowingly created a great risk of death to many persons.

(4) The murder was committed for remuneration or the promise of remuneration or the defendant employed another to commit the murder for remuneration or the promise of remuneration.

(5) The murder was especially heinous, atrocious or cruel, manifesting exceptional depravity.

(6) By the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life.

(7) The murder was one defined as murder of the first degree by section 18–4003, Idaho Code, subsections (b), (c), (d), (e) or (f), and it was accompanied with the specific intent to cause the death of a human being.

(8) The defendant, by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society.

(9) The murder was committed against a former or present peace officer, executive officer, officer of the court, judicial officer or prosecuting attorney because of the exercise of official duty.

(10) The murder was committed against a witness or potential witness in a criminal or civil legal proceeding because of such proceeding."

*ing circumstance from among those enumerated in Section 19–2515, Idaho Code.*

■ Lankford argues that the evidence was insufficient to support the district court's finding of the statutory aggravating factors. Lankford claims that the evidence also failed to show (1) that the murder and the circumstances surrounding its commission demonstrated an utter disregard for human life; (2) that the defendant acted calmly or in a calculated manner; (3) that the defendant has a propensity to commit murder which will probably constitute a continuing threat to society; (4) that the defendant's acts were accompanied by a specific intent to kill.

After reviewing the complete record in this case, it is evident that the trial court's finding of the aggravating circumstances listed above were clearly supported by the evidence produced. Lankford's testimony clearly supports aggravating circumstances (1), (2) and (4).

(3) *Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.*

■ Finally, we have conducted our proportionality review as required by I.C. § 19–2827. To complete this process, we have reviewed the sentence imposed and the sentences imposed in similar cases in an effort to assure that the sentence in this case was not excessively disproportionate.[14] In making such a comparison, we have generally considered (1) the nature of and the motive for the crime committed; (2) the heinous nature of the crime; and (3) the nature and character of the defendant to determine whether the sentence was proportionate and just. After thoroughly examining the record and evaluating these factors, we find nothing that would indicate that the sentence of death imposed against Lankford was disproportionate or unjust.

**14.** Those cases we have considered include: *State v. Johns,* 112 Idaho 873, 736 P.2d 1327 (1987); *State v. Stuart,* 110 Idaho 163, 715 P.2d 833 (1985); *State v. Windsor,* 110 Idaho 410, 716 P.2d 1182 (1985); *State v. Scroggins,* 110 Idaho 380, 716 P.2d 1152 (1985); *State v. Fetterly,* 109 Idaho 766, 710 P.2d 1202 (1985); *State v. Bean,* 109 Idaho 616, 710 P.2d 526 (1985); *State v. Aragon,* 107 Idaho 358, 690 P.2d 293 (1984); *State v. Bainbridge,* 108 Idaho 273, 698 P.2d 335 (1985); *State v. Paradis,* 106 Idaho 117, 676 P.2d 31 (1983); *State v. Gibson,* 106 Idaho 54, 675 P.2d 33 (1983); *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983); *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983); *State v. Major,* 105 Idaho 4, 665 P.2d 703 (1983); *State v. Mitchell,* 104 Idaho 493, 660 P.2d 1336 (1983), *cert. den.,* 461 U.S. 934, 103 S.Ct. 2101, 77 L.Ed.2d 308 (1983); *State v. Carter,* 103 Idaho 917, 655 P.2d 434 (1982); *State v. Olin,* 103 Idaho 391, 648 P.2d 203 (1982); *State v. Stormoen,* 103 Idaho 83, 645 P.2d 317 (1982); *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981); *State v. Griffiths,* 101 Idaho 163, 610 P.2d 522 (1980); *State v. Padilla,* 101 Idaho 713, 620 P.2d 286 (1980); *State v. Fuchs,* 100 Idaho 341, 597 P.2d 227 (1979); *State v. Needs,* 99 Idaho 883, 591 P.2d 130 (1979); *State v. Lindquist,* 99 Idaho 766, 589 P.2d 101 (1979); *State v. Bradley,* 98 Idaho 918, 575 P.2d 1306 (1978); *State v. Birrueta,* 98 Idaho 631, 570 P.2d 868 (1977); *State v. Allen,* 98 Idaho 782, 572 P.2d 885 (1977); *State v. Ward,* 98 Idaho 571, 569 P.2d 916 (1977); *State v. Gerdau,* 96 Idaho 516, 531 P.2d 1161 (1975); *State v. Powers,* 96 Idaho 833, 537 P.2d 1369 (1975) *cert. den.,* 423 U.S. 1089, 96 S.Ct. 881, 47 L.Ed.2d 99; *State v. Hokenson,* 96 Idaho 283, 527 P.2d 487 (1974); *State v. Hatton,* 95 Idaho 856, 522 P.2d 64 (1974); *State v. Standlee,* 96 Idaho 165, 525 P.2d 360 (1974); *State v. Foley,* 95 Idaho 222, 506 P.2d 119 (1973); *State v. Beason,* 95 Idaho 267, 506 P.2d 1340 (1973); *State v. Atwood,* 95 Idaho 124, 504 P.2d 397 (1972); *State v. Sanchez,* 94 Idaho 125, 483 P.2d 173 (1971); *State v. Gomez,* 94 Idaho 323, 487 P.2d 686 (1971); *State v. Dillon,* 93 Idaho 698, 471 P.2d 553 (1970), *cert. den.,* 401 U.S. 942, 91 S.Ct. 947, 28 L.Ed.2d 223 (1971); *State v. Radabaugh,* 93 Idaho 727, 471 P.2d 582 (1970); *State v. Rodriguez,* 93 Idaho 286, 460 P.2d 711 (1969); *State v. Jiminez,* 93 Idaho 140, 456 P.2d 784 (1969); *King v. State,* 93 Idaho 87, 456 P.2d 254 (1969); *State v. Gonzalez,* 92 Idaho 152, 438 P.2d 897 (1968); *State v. Chaffin,* 92 Idaho 629, 448 P.2d 243 (1968); *Carey v. State,* 91 Idaho 706, 429 P.2d 836 (1967); *State v. Koho,* 91 Idaho 450, 423 P.2d 1004 (1967); *State v. Anstine,* 91 Idaho 169, 418 P.2d 210 (1966); *State v. Gish,* 87 Idaho 341, 393 P.2d 342 (1964); *State v. Clokey,* 83 Idaho 322, 364 P.2d 159 (1961); *State v. Burris,* 80 Idaho 395, 331 P.2d 265 (1958); *State v. Snowden,* 79 Idaho 266, 313 P.2d 706 (1957); *State v. Buchanan,* 73 Idaho 365, 252 P.2d 524 (1953); *State v. Owen,* 73 Idaho 394, 253 P.2d 203 (1953) (considered only in terms of crime committed and penalty imposed; overruled on substantive law point in *State v. Shepherd,* 94 Idaho 227, 486 P.2d 82 (1971)); *State v. Pettit,* 104 Idaho 601, 661 P.2d 767 (Ct.App.1983); *State v. Fenley,* 103 Idaho 199, 646 P.2d 441 (Ct.App.1982).

In this case, Lankford was found guilty of a savage murder against two innocent campers who were selected because they owned a van which the defendant intended to steal. Lankford came into their camp wielding a shotgun which must have ultimately led to Mr. Bravence's (who was a captain in the United States Marine Corps) subservient compliance with Lankford's brother's order to kneel on the ground where he was bludgeoned to death. Jurors could reasonably have inferred that Mr. Bravence complied with the demand to kneel on the ground because of the defendant's menacing display of the shotgun. After Mr. Bravence was mortally wounded, Mrs. Bravence returned from the creek. She was ordered onto the ground and unmercifully killed by a blow to the head without a word of protest from Lankford. Although Lankford testified that he did not intend that the Bravences die, Lankford not only participated in the murders, but he did nothing to prevent his brother from bludgeoning Mrs. Bravence after he had witnessed the savage consequences of the nightstick attack on Mr. Bravence. The attack was brutal and one that could only have been intended to kill the victims because of the severity of the blows. The district court judge was entirely justified in finding from these facts that Lankford was a major participant in the killings and that he intended that the Bravences die.

The character and nature of Lankford leads to the conclusion that he was an extremely dangerous person. The fact that the murders were committed while Lankford was in violation of parole on a robbery charge in Texas, and was fleeing from the authorities, indicated to the sentencing court that he has little respect for the law or for fellow human beings, and the record substantiates this finding.

Our review of similar recent cases demonstrates that Lankford's acts can be easily aligned with other Idaho cases in which the death penalty was imposed. In *State v. Gibson*, 106 Idaho 54, 675 P.2d 33 (1983), and *State v. Paradis*, 106 Idaho 117, 676 P.2d 31 (1983), the nature of the crime and the character of the defendants were similar to this case. The murders in those cases were not only brutal, but the defendants had, like Lankford, prior criminal records. In *State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983), defendant viciously murdered his female victim who was a former co-worker. Sivak, like Lankford, had a prior criminal record. In these and other recent cases the aggravating circumstances surrounding the commission of the crime far outweighed any mitigating circumstances.

In *State v. Aragon*, 107 Idaho 358, 690 P.2d 293 (1984), we stated:

"We acknowledge the trial court's superior ability to observe witnesses and their demeanor during the sentencing phase of a trial, and especially the unique ability of the trial judge to observe the character and demeanor of the defendant, a tool essential to the ultimate goal of tailoring a sentence to a particular defendant. With that unique ability of the trial court in mind, we have determined that the sentence imposed in the present case is not out of proportion to the sentence heretofore imposed." 107 Idaho at 369, 690 P.2d at 304.

We find that the trial court exercised this unique ability, understood the record in detail, and acted in accordance with Idaho statutory procedure to sentence the defendant to death.

The judgment of conviction and the sentence imposed are affirmed.

SHEPARD, C.J., and DONALDSON and HUNTLEY, JJ., concur.

HUNTLEY, Justice, concurring.

While concurring in the majority opinion, I do so with the reservation that I remain convinced that Idaho's death sentence procedure, in failing to utilize the jury in the process, violates the Idaho Constitution for the reasons I have stated in *State v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983), and, *State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983).

Additionally, I agree with United States Supreme Court Justice John Paul Stevens and Justice Bistline that achievement of proportionality and the imposition of the

death penalty only in appropriate cases can best be obtained when the decision to impose that penalty is made by a jury rather than by a single governmental official.

Judges should resist the constant temptation our offices present to arrogate power unto ourselves to the detriment of the jury system.

BISTLINE, Justice, concurring only in affirming the verdict and dissenting.

## I.

The most important issue at stake here was the last dealt with in the majority opinion, Part IV(3): "Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."[1] The majority, in its footnote 14, runs off its usual routine string of cases in support of its routine declaration that "we have reviewed the sentence imposed and the sentences imposed in similar cases in an effort to assume that the sentence in this case was not excessively disproportionate." Added to that string of cases for the first time, and prominently heading the list, are *State v. Windsor*, 110 Idaho 410, 716 P.2d 1182 (1985), and *State v. Scroggins*, 110 Idaho 380, 716 P.2d 1152 (1985), *State v. Beam*, 109 Idaho 616, 710 P.2d 526 (1985), and *State v. Fetterly*, 109 Idaho 766, 710 P.2d 1202 (1985). The majority opinion, however, contains surprising little informing the reader as to what dispositions were made in the string of cases cited, and especially with regard to the two last cited, or how Lankford's death-deserving conduct measured up to the death-deserving and death-undeserving conduct in the string, other than this much:

Our review of similar recent cases demonstrates that Lankford's acts can be easily aligned with other Idaho cases in which the death penalty was imposed. In *State v. Gibson*, 106 Idaho 54, 675 P.2d 33 (1983), and *State v. Paradis*, 106 Idaho 117, 676 P.2d 31 (1983), the nature of the crime and the character of the

defendants were similar to this case. The murders in those cases were not only brutal, but the defendants had, like Lankford, prior criminal records. Majority op., p. 704, 747 P.2d, p. 726.

All that the majority does in its proportionality review is to portray the conduct of Lankford in connection with the killing of the Bravence couple from which it is concluded that: "The district court judge was entirely justified in finding from these [recited] facts that Lankford was a major participant in the killings and that he intended that the Bravences die." Majority op., at p. 704, 747 P.2d at p. 726. The majority opinion appears to be patterned after that of the Arizona Supreme court in its second review of the *Raymond Tison* case on post-conviction proceedings:

Intent to kill includes the situation in which the defendant intended, contemplated, or anticipated that lethal force would or might be used or that life would or might be taken in accomplishing the underlying felony. *State v. Raymond Tison*, 142 Ariz. [454] at 456, 690 P.2d [755] at 757 [1984].

Felony murder is first degree murder, and it can merit life imprisonment. Felony murder is not, however, necessarily premeditated first degree murder, which can merit the death penalty. The majority opinion correctly reports that the district court ruled that there was a specific intent to cause the deaths of the victims, BUT, the majority avoids taking note that the trial court was careful not to make a finding that such intent was attributable to Bryan Lankford and instead made this finding:

(d) The murders were defined as murder of the first degree by Idaho Code Section 18–4003(d), and the murders were accompanied with the specific intent to cause the deaths of Mr. and Mrs. Bravence. R., p. 348.

That language, beyond any doubt, may have application to the conduct of Mark

---

1. A discussion of Part IV(3) necessarily includes comment on that portion of Part IV(2) where the majority, at p. 703, 747 P.2d at p. 725, upholds what it misreads as aggravating Finding No. 4: "That the defendant's acts were accompanied by a specific intent to kill."

Lankford, as described by Bryan Lankford. The majority opinion recites that "Lankford testified that he did not intend that the Bravences die," which is correct. He also testified that he did not know in advance what Mark Lankford had in mind, other than the stealing of a vehicle:

> The Defendant testified at his trial that he and his brother decided to leave Idaho because it got cold ... He further testified that his brother, Mark Lankford, decided to steal a van and talked Defendant into going along with the theft.... The Defendant testified that he never planned on shooting anyone, though he did carry the shotgun into the campsite at his brother's request.... He then testified that while he was talking to the man (Robert Bravence), Mark Lankford came out of the bushes and told the man to get down on the ground.... Mark Lankford then hit the man over the head with a club.... When Mrs. Bravence came up from the river, Mark Lankford told her to get down on the ground and upon doing so, Mark Lankford hit her across the back of the neck.... The Defendant and Mark Lankford then picked up the Bravences and placed them into the van. ... The Defendant then drove the van back to the Lankford's former campsite. ... Upon arriving at the area, the Defendant stayed in the car because he was "hysterical", "crying and very upset" while Mark Lankford took the people into the woods.... The Defendant did not think that the people were dead at the time that Mark Lankford carried them into the woods.... The Lankfords then drove to Oregon.... The Defendant further testified that he signed charge receipts at the Holiday Inn in Wilsonville and other places because his brother told him to do so.... The Defendant further testified that Mark did not generally get along with people because he was violent

and had a very bad temper most of the time. Defendant's Brief, pp. 6–7.

The foregoing is excerpted from the Defendant's Brief. It compares favorably with the majority's recitation, pp. 691–692, 747 P.2d pp. 713–714.

There is here, then, no contention, and also no jury finding, that Bryan Lankford delivered any of the death blows.[2] The majority upholds the imposition of the death penalty upon being able to see validity in the judge's finding, as rewritten by the majority, that Bryan Lankford "intended that the Bravences die." This misstatement of what the trial judge actually wrote is blatant and inexcusable, but serves the majority's purpose in choosing language which the majority prefers to believe was what the district judge really meant to say—so as to be brought in conformance with *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140—which is barely mentioned in the majority opinion,[3] although it was thoroughly discussed in the *Windsor* majority opinion, *Windsor, supra*, 110 Idaho at 418–19, 716 P.2d 1182.

The majority closes its cursory proportionality review with a quotation from *State v. Aragon*, which is delivered much as a blessing might be:

> We acknowledge the trial court's superior ability to observe witnesses and their demeanor during the sentencing phase of a trial, and especially the unique ability of the trial judge to observe the character and demeanor of the defendant, a tool essential to the ultimate goal of tailoring a sentence to a particular defendant. With that unique ability of the trial court in mind, we have determined that the sentence imposed in the present case is not out of proportion to the sentence heretofore imposed. *State v. Aragon*, 107 Idaho 358, 369, 690 P.2d 293, 304 (1984).

The Court's opinions in the cases of *Windsor* and *Scroggins* failed to acknowledge

---

**2.** This will be discussed *infra* in connection with Part I(e) of the majority opinion, which deals with instructions and particularly the failure to give defendant's Requested Instruction No. 4.

**3.** Even more strange is the majority's decision to give no consideration to *Tison v. Arizona*, —— U.S. ——, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). Its content was discussed by counsel at oral argument and is more applicable than *Enmund*.

the trial court's superior ability, and did not keep in mind that "unique ability." To the contrary, the Court, in *Windsor* and also in *Scroggins*, came out with a "newly enunciated doctrine of" paramount exercise of discretion which resulted in a Supreme Court " 'qualitative review' of the record" from which "the Supreme Court determined that the sentence of death in the *Windsor* and *Scroggins* cases were excessive and disproportionate." Those quotations are, of course, taken directly from the eloquent order of disqualification authored by the Honorable Edward J. Lodge, the district judge who presided in the *Windsor* case and also in the *Scroggins* case, where in both cases he had imposed a sentence of death. Judge Lodge wrote courageously and concisely on the requirement of proportionality, and this Court's debasement of that doctrine. And Judge Lodge wrote from a position where only he was best positioned to make an assessment that was direly in need of being made. He had also, using his own words, "accepted that awesome responsibility" in imposing the death sentence on Fetterly, who was Windsor's co-defendant charged, tried, and convicted for the murder of Sterling Grammer, and also in imposing the death penalty on Beam, who was Scroggins' co-defendant charged, tried, and convicted for the murder of thirteen-year-old Mondi Lenten. Because the issue presently under address is proportionality, and because on previous occasions I have been impelled to the view that Idaho will only achieve any degree of reasonable proportionality in capital sentencing by restoring to the jury "that awesome responsibility," it is clearly in order that in Judge Lodge's own words the circumstances of *Windsor* and *Scroggins* be submitted to a candid world:

"Idaho Code Section 19–2827(c)(3) is seemingly clear in providing that the responsibility of this state's Supreme Court in reviewing a death sentence is to ascertain whether a death penalty is 'excessive' or 'disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant,' and *not* that the appellate court exercise what has been referred to as a 'qualitative discretionary review' or an 'independent review.' With all due respect, it is difficult for this court to believe that such a 'qualitative review' undertaken by the Supreme Court is more legitimate than the trial court's assessment after having personally participated in all the proceedings and having had the firsthand opportunity to evaluate the facts, circumstances, and persons involved in a capital case, particularly when two members of the Supreme Court are predisposed to find against the legitimate imposition of a death sentence when it is prescribed by the court as opposed to a jury. Rather, the decision-making responsibility always has been and always should be in the trial court, and only when there is determined to be an *abuse* of that discretion should an appellate court intercede. The United States Supreme Court held in *Spaziano vs. Florida*, [468 U.S. 447] 104 S.Ct. 3154 [82 L.Ed.2d 340] (1984), that sentencing by a trial judge satisfied both the Sixth and Eighth Amendments because 'a trial judge is more like a jury than he is like an appellate court. Like a jury, he has seen the witnesses and is well positioned to make those determinations of demeanor and credibility that are peculiarly within a trial judge's province.' The same can be said for all the nuances involved in the trial of a capital case which are not 'in the record,' but which are within the observations and knowledge of the trial judge, including community outrage and/or tolerance, community expectations and societal goals, the rights and needs of a victim's family, and the totality of the circumstances surrounding the defendant.

"The records in the *Windsor* and *Scroggins* cases amply support the determination that both defendants *personally intended that their victims suffer death*, a finding made by both the trial court and the jury which satisfies the Eighth Amendment as well as the rule of *Enmund vs. Florida*, 45 [458] U.S. 782 [102 S.Ct. 3368, 73 L.Ed.2d 1140] (1982). Yet, *even though findings regarding the personal responsibilty and moral guilt of each defendant were made by the trial court and are supported by the evidence, these defendants have escaped punishment for their actions*

*equivalent to that imposed on their co-defendants,* whose death sentences have been affirmed on appeal. Despite a record which strongly indicate that in their respective cases both Scroggins and Windsor were *the* motivating forces behind the commission of the crimes and were in fact the catalysts which set the crimes in motion, a situation has resulted which suggests that 'where the death of another is attempted by two people . . ., he or she who was less successful must yield the hangman's noose to the one to whom must go the honor of inflicting the blow or wound which gains the medical credit for producing the victim's expiration.' 85 I.S.C.R. at 2566 (Justice Bistline's separate opinion). *In both cases it is clear that Windsor and Scroggins knew that the victim was to be killed and were actively and inextricably entwined in the victim's fate.* With the possible exception of the Creech cases, where there have been multiple deaths, this court is not aware of any murder case in this state where the death penalty has been upheld which would offend the average person more than the facts presented in *Windsor* and *Scroggins.*

"In the *Windsor* opinion the Supreme Court maintained that Windsor's level of participation in the crime was sufficiently different from that of her co-defendant Fetterly so as to justify the disparity in their sentences. Additionally, certain other factors were cited: her lack of formal criminal record; the lack of significant prior criminal activity; the lack of evidence regarding any history of violent behavior or propensity toward violence; her cooperation with authorities both after arrest and during incarceration; her troubled childhood; and her strong rehabilitative potential. *This review glossed over the facts of Windsor's actual involvement* in bringing about Sterling Grammer's death and instead emphasized the mitigating factors which were thoroughly considered by this court and found not to outweigh the aggravating factors.

"Identified in the *Scroggins* opinion as justification for vacating the death sentence was Scroggins' lesser criminal involvement in the killing of thirteen-year-old Mondi Lenten, compared to that of co-defendant Beam, as well as his unstable upbringing, mental and chronological age, level of cooperation, and lack of history of violent criminal conduct. However, the record in this case supports the conclusion that any disparity between Scroggins' and Beam's participation is a distinction with little difference. It is true that the Scroggins jury did not find him guilty beyond a reasonable doubt of slitting his victim's throat, but neither did the jury so find in Beam's case; yet it most certainly happened, and both defendants are legally responsible. Additionally, while Scroggins was convicted of the included offense of Attempted Rape and Beam was convicted of Rape as charged, the *Scroggins* verdict must be viewed in light of the evidence. It is inconceivable to this court that Scroggins should be given any consideration in the sentencing process for the disparity in the verdicts when the only reasonable explanation for Scroggins' not accomplishing the rape, in light of all the other evidence, was that his victim, in a final and desperate measure, forced a bowel movement in the hope that the excrement would turn Scroggins away, and when the evidence indicates that he still forced her to commit an act of fellatio on him. Also, the fact that Scroggins reported the crime has to be viewed in context in order to see it for what it was. First, Scroggins when home and went to sleep with no pangs of conscience after having been involved in a brutal slaying. The next day, under parental influence, and with co-defendant Beam on the run and a handy 'fall guy,' Scroggins went to the police. No one involved in this case—police, investigators, the jury, or this court— has ever found or believed that Scroggins told the truth about what happened to Mondi Lenten, except to the extent that he did lead the police to the crime scene, which he of course had to do in his attempt to place the blame on Beam, his supposed friend. Additionally, while the Supreme Court's opinion suggests that the trial court weighted Scroggins' likely performance in a penal setting more heavily than it in fact did in support of the decision to impose a

death sentence, a recent check with the warden of the Idaho State Penitentiary demonstrated that this court's assessment was borne out upon Scroggins' release from death row, whereupon his conduct caused him to be first placed in the 'hole,' and then in close or protective custody. Finally, this court carefully considered the mitigating factors identified by the Supreme Court in its opinion prior to determining at the time of sentencing that the mitigating factors did not outweigh Scroggins' culpability for the crime and the nature of his character.

*"The crimes committed by both Scroggins and Windsor were accomplished under such circumstances that reasonable minds could not differ about the fact that there was in each case a knowing and final betrayal by the defendant of any respect for human life.* Even after a careful consideration of the mitigating factors in their respective cases, it was and still is the conclusion of this court that these mitigating facts do not outweigh the aggravating factors. While a defendant may demonstrate a change of heart once he or she is cornered, may become cooperative, may display some rehabilitative potential, and may work within the system to emphasize his or her good points and to obscure the bad ones, these factors in and of themselves must not automatically overshadow a defendant's culpability for the crime which has been committed and for the life which he or she has previously led, if there is to be any validity to the sentencing objective of protecting society in addition to serving the interests of a defendant. Further, where a court must give a disproportionate amount of weight to matters which occur after the commission of a crime, *there never will be proportionality in sentencing between the advantaged and the disadvantaged."*

Order of Disqualification, *State v. Windsor* and *State v. Scroggins,* pp. 3–10 (emphasis added).

My opinion filed in the *Windsor* case demonstrates that my views were the same as those of Judge Lodge. At page 428 of 110 Idaho, 716 P.2d 1182, I wrote:

The majority makes much of Windsor's childhood and her background in general. All of these factors were first considered by the trial judge. The fact remains that, just as the judge observed, two people, Windsor and Fetterly, set out together on this crime spree which culminated in the death of their selected victim. This is not an *Enmund* situation— not even a distant cousin of *Enmund.*

and, at page 432, 716 P.2d 1182;

Here we have no driver of a get-away car—completely detached from the scene of a murder-in-progress. Hence, I see no necessity for the majority's considerable exertion in reaching the conclusion that "there is no merit to Windsor's contention that the imposition of the death penalty was constitutionally impermissible under the mandate of *Enmund.*

The majority, in its *Windsor* opinion, nevertheless found justification for allowing her to escape the death penalty which had also been meted out to Fetterly, and *affirmed,* in the disparate sentences imposed on Bainbridge, *State v. Bainbridge,* 108 Idaho 273, 698 P.2d 335 (1984), and Sivak, *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983), and likewise the sentences imposed on McKinney, *State v. McKinney,* 107 Idaho 180, 687 P.2d 570 (1984), and Small, *State v. Small,* 107 Idaho 504, 690 P.2d 1336 (1984):

In both sets of cases, the defendant who did the actual killing was given the death penalty while his co-defendant received a life sentence. The difference in their degree of participation in the crime appeared to be the primary factor justifying the disparity in sentences in both sets of cases. *Windsor, supra,* 110 Idaho at 421, 716 P.2d 1182.

The majority in *Sivak* upheld the imposition of the death penalty, and had the effrontery to observe that:

I.C. § 19–2827 requires us to conduct a review of the record to determine if this particular death sentence resulted from any arbitrary factors, such as passion or prejudice. That section also requires us to determine if the sentence imposed in this particular case is excessive or dispro-

portionate to sentences imposed in similar cases. Our independent review of this case does not reveal any indication of existence of arbitrary factors. *Our review of similar cases involving the death penalty, while necessarily limited by the lack of such cases, as noted in State v. Creech, supra, does not reveal the presence of any particular excessiveness or disproportionality in this particular case.* The heinous nature of the crime committed in this case, and the nature and character of the defendant, makes the imposition of the death penalty in this case both proportionate and just. *Sivak, supra,* 105 Idaho at 908, 674 P.2d 396 (emphasis added).

But, the majority not at that time incorporating a string citation of cases reviewed, artfully ignored *State v. Major,* 104 Idaho 4, 665 P.2d 703 (1983, a first degree *premeditated* murder conviction—a brutal stabbing—where the death sentence was not imposed. Equally ignored was a companion case to *Sivak,* namely *Bainbridge, supra,* where the death penalty was not imposed. Nor can it be said in defense of the *Sivak* majority that omission of any comparison to *Major* and *Bainbridge* was inadvertent. My own opinion rather forcibly brought those other cases to the fore:

It is difficult, if not impossible, to reconcile the two sentences. One murderer dies; the other lives. This is a classic case of the disparity in sentencing which produced *Furman* and in turn led to the second series of cases four years later wherein the Supreme Court declared that *Furman* had been misunderstood, while Idaho in the interim destroyed death penalty sentencing procedures which would today be entirely valid according to my own reading of the "threshold theory" which the Supreme Court now retreats to in *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). I am not critical of Justice Stevens' opinion—which was expected. At the same time I agree with the view of Justice Marshall that "the States may as well be permitted to re-enact the statutes that were on the books before *Furman.*" 462 U.S. at 910–11, 103 S.Ct. at 2760. For, as I have

stated and written even prior to receiving *Zant,* Idaho's procedure in capital sentencing did not lead to arbitrary and capricious imposition of death sentences. Well instructed juries would hear evidence offered in mitigation and in aggravation, and would decide between life or death. Bifurcation of the guilt phase from the penalty phase would serve to avoid undue prejudice to a defendant charged with first degree murder. *Sivak, supra,* 105 Idaho at 914, 674 P.2d 396.

In that opinion, writing primarily for the education of the majority who did not seem to be aware of *Bainbridge,* the involvement of both Sivak and Bainbridge, highly similar to the joint involvement of Fetterly and Windsor, and also to the joint involvement of Scroggins and Beam, it was pointed out that:

Two men, Sivak and Bainbridge, were found guilty of first degree murder which was committed in the course of a planned robbery of a gas station attendant who was acquainted with both and who could have identified both individuals. The attendant, a woman but a few years older than the defendants, was stabbed twenty times and shot three times—a brutal murder if ever there was one. The two were jointly charged, as they should have been, given a preliminary hearing, and held to answer. A single information was filed charging them jointly with armed robbery, premeditated murder, and murder in committing a felony of robbery, as they should have been charged. Neither made a motion for separate trial, apparently being unable to show the prejudice required by our case law, and they should have been tried together. But they were not so tried. One defendant, Bainbridge, filed an affidavit of disqualification against Judge Newhouse, who thereupon disqualified himself as to Bainbridge only, for which there may or may not be precedent in some other jurisdiction. In any event, Judge Newhouse assigned Bainbridge's trial to Judge Rowett. In that strange manner the co-

defendants were not tried together as they should have been for the crimes the two of them committed, but the results of the guilt trials came out the same, as both were convicted of first degree murder. There is little doubt in my mind, after reviewing the facts and circumstances of the crimes, that had they been tried jointly and had the jury been the sentencer both would have suffered the same fate. But they were not tried together for their jointly committed crimes as they should have been, and a jury was not the sentencer as should have been the case. As it stands now, one dies and one lives. If this is not disparate sentencing, then I do not expect to ever see it.

The two co-defendants were not only bungling criminals and inept, and thus brutal murderers, but also not loyal to each other. Sivak, who testified at his trial, claimed that Bainbridge did all of the robbing and murdering while he, Sivak, was merely in the company of Bainbridge at a poor time. Bainbridge, who did not testify at his trial, gave taped statements to the investigating officers which, on his turn to talk, blamed the entire criminal activity on Sivak, Bainbridge by misadventure merely happening to be with him at the wrong time and place, as it turned out. There were no other witnesses to the crime of murder than these two defendants. The two different juries convicted both of first degree murder and robbery, Sivak testifying to his innocence, Bainbridge not taking the stand. Neither testified at the other's trial. Notwithstanding like jury verdicts the district judges involved imposed the drastically different sentences for the same crime of murder. As acknowledged in the majority opinion in Part II B, Judge Newhouse in Sivak's case made a § 19–2515 finding that "[t]he defendant dominates his co-defendant and is primarily responsible for all that occurred." The majority, notwithstanding the provisions of I.C. § 19–2827, makes no mention of the penalty imposed in *Bainbridge,* and strangely does not mention the complementing findings of Judge Rowett in Bainbridge's case that "[a]lthough he had the opportunity and the encouragement of the co-defendant to do so, defendant did not himself inflict any death threatening wounds on the victim," and "that defendant did not himself deliver any death threatening blows to the victim...." *Id.* at 915–16, 674 P.2d 396.

Following which, on the issue of required proportionality, I added my assessment in regard to *Sivak* and *Bainbridge* which, I am gratified to be able to say now, is much the same as Judge Lodge's post-mortem review of *Windsor* and *Fetterly* following this Court's setting aside of the death penalty imposed on Windsor:

Now, a large difficulty with these two cases and the disparity in penalties imposed, is an inability to see how it would make any genuine difference which of the two defendants delivered the more telling blows, knife wounds, or shots against and into their helpless victim. The cold inescapable fact is that *they* murdered her, and that the two district judges, neither of whom ever heard Bainbridge testify as to the circumstances of the crime, and only one who heard Sivak testify, could both to a degree exonerate Bainbridge at Sivak's fatal expense is regrettably to my mind unacceptable. Moreover, it highlights the bizarre results of having two separate trials where there should have been a single trial, and drives home the importance of adhering to jury death sentencing as is a defendant's right under the Idaho Constitution. *Id.* at 916, 674 P.2d 396.

Judge Lodge, where proportionality is involved, performed a great service for the State of Idaho in speaking out against this Court's disparate sentencing in *Windsor* viz-a-viz *Fetterly,* and in *Scroggins* viz-a-viz *Beam.* Had he also written of *Sivak* and *Bainbridge,* an even greater service would have occurred. It is, in my view, of extreme importance that this Court, and the legislature, be given the considered concensus of the state's district judges in the area of capital sentencing. To date, other than for Judge Oliver's rebuke of

this Court's reversal of a death sentence imposed by him, *see State v. Osborne,* 104 Idaho 809, 823, 663 P.2d 1111, 1125 (1983) (Bistline, J., concurring and dissenting), only Judge Lodge has let his views be known, and then only when his conscience so motivated him. It is to be remembered that only in recent years have the state's district judges had thrust upon them that "awesome responsibility." In speaking out against this Court's reversal of the death sentence in *Windsor,* Judge Lodge noted that, in evaluating the wisdom of appellate court sentencing, "a trial judge is more like a jury than he is like an appellate court. Like a jury, he has seen the witnesses and is well positioned to make those delineations of demeanor and credibility that are peculiarly within a trial judge's province." He was quoting from *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). Because a jury is more like a jury than is a trial judge like a jury, and speaking as one member of this Court, I express the view that everyone involved in capital sentencing, at whatever level, would greatly benefit if the views of Judge Lodge were made available, together with those of all the state's district judges, on the appropriate comments of United States Supreme Court Justice John Paul Stevens, also writing in *Spaziano,* and joined by two other justices. His beliefs are more readily available in *State v. Stuart,* 110 Idaho 163, 179–81, 715 P.2d 833, 849–51 (1985) (Bistline, J., dissenting). In sum, Justice Stevens stated it thus:

> "In the 12 years since *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), every Member of this Court has written or joined at least one opinion endorsing the proposition that because of its severity and irrevocability, the death penalty is qualitatively different from any other punishment, and hence must be accompanied by unique safeguards to ensure that it is a justified response to a given offense. Because it is the one punishment that cannot be prescribed by a rule of law as judges normally understand such rules, but rather is ultimately understood only as an expression of the community's outrage—its sense that an individual has lost his moral entitlement to live—I am convinced that *the danger of an excessive response can only be avoided if the decision to impose the death penalty is made by a jury rather than by a single governmental official.* This conviction is consistent with the judgement of history and the current consensus of opinion that juries are better equipped than judges to make capital sentencing decisions. *The basic explanation for that consensus lies in the fact that the question whether a sentence of death is excessive in the particular circumstances of any case is one that must be answered by the decision maker that is best able to 'express the conscience of the community on the ultimate question of life or death.'* Witherspoon v. Illinois, 391 U.S. 510, 519, 88 S.Ct. 1770, 1775, 20 L.Ed.2d 776 (1968) (footnote omitted).

> . . . .

> "Thus, the legitimacy of capital punishment in light of the Eighth Amendment's mandate concerning the proportionality of punishment critically depends upon whether its imposition in a particular case is consistent with the community's sense of values. Juries have historically been, and continue to be, a much better indicator as to whether the death penalty is a disproportionate punishment for a given offense in light of community values than is a single judge. If the prosecutor cannot convince a jury that the defendant deserves to die, there is an unjustifiable risk that the imposition of that punishment will not reflect the community's sense of the defendant's 'moral guilt.'" *Spaziano, supra,* 104 S.Ct. at 3167–78 (footnotes omitted). *State v. Stuart,* 110 Idaho 163, 179–81, 715 P.2d 833, 849–51 (1985) (emphasis added).

That which is also missing from the majority opinion is any discussion comparing Bryan Lankford's conduct with that of his brother Mark Lankford, notwithstanding, as was equally true in *Sivak,* where we had the record on appeal here in the clerk's office, we also have the record in the Mark Lankford case. Should proportionality be

considered as it was by the majority in *Windsor, i.e.,* her culpability as compared to Fetterly's, or should it be as it is today, comparing the murder of the Bravences in relation to the murders perpetrated by Paradis and Gibson? On this sad state of affairs, I continue to find appropriate my final remarks in the *Stuart* case:

As I wrote in *Sivak* or *Bainbridge*, the proportionality requirement prescribed by the Supreme Court and in turn adopted by the Idaho legislature is virtually meaningless. Proportionality in capital sentencing in Idaho will only result *when first degree murder charges are all tried to a jury,* and the jury also as the conscience of the community makes the awesome decision of life or death where a first degree murder verdict is returned.

How there can ever be any real proportionality continues to escape me where prosecutors exercise a divine right to reduce the charge and to ask or not ask for the death penalty, as may at the moment so move them. Recently, the citizens of Ada County were given to understand that the prosecutor had decided that on a guilty plea to the execution-style murder of a girl in her twenties, *he* would not ask for the death penalty. Other defendants so accused do not fare so well. Such matters are not for mortal prosecutors, but for mortal jurors. *Id.* at 202, 715 P.2d 833 (emphasis original).

With Windsor, Scroggins, Bainbridge, and Osborn having escaped the death penalty by reason of the (erroneous) grace of this Supreme Court, how is it that in the name and pursuit of proportionality, the remittiturs are not recalled and proportionality meted out as it should be. Precedent is not lacking. *State v. Ramirez,* 34 Idaho 623, 203 P. 279 (1921), which was discussed most recently in *State v. Stuart,* 110 Idaho at 228–29, 715 P.2d 833 (Bistline, J., dissenting on rehearing).

## II.

The majority's overuse of literary license in regard to Bryan Lankford's "numerous confessions regarding the killings," at p. 692, 747 P.2d at p. 714, merits some com-

ment in passing. Putting aside the loose use of "confessions," "admission" and "statements" as though the same are interchangeable, it would seem to me that if the majority has found in this voluminous appeal record any confession by Bryan Lankford to his killing of either of the Bravences, it would be put on display without the least hesitation, just as the majority did, and accurately set out a synopsis of his testimony at trial. Where the majority asserts that there are such confessions, admissions, and statements without any elaboration or explanation as to content, it can only be assumed that it is a ployful play on words. The robbery was undoubtedly what led to the killings, hence, if Bryan Lankford conceded his complicity in the robbery, which he did by his own testimony, the majority is able to leave the reader believing that his statements, admissions, and confessions were that he participated in the killing. Seeing no reason for such shenanigans in writing a decision in a death penalty case, with some trouble I have located the oral recitation of the "written confession to an FBI agent." Working in Texas, he became aware that the Bravences were missing, and last seen in Idaho, and ultimately got involved with Bryan and Mark Lankford at the sheriff's office in Liberty County, Texas, where the two Lankfords were jailed. He testified only as to his interview with Bryan and a *statement* signed by him, and the discussion which led up to it. The statement was marked as Exhibit 76, admitted into evidence by the court, there being no objection, but Exhibit 76 does not seem to be amongst the exhibits. Mr. Ploeger, the agent, read it in giving his testimony after first detailing how it was procured:

BY MR. ALBERS:

Q. Let's try again. How did the interview progress? What happened within the interview?

A. Okay. I interviewed him told him what we wanted to talk to him about and so forth. He told several stories; and, then, we ultimately prepared a signed statement.

Q. And how was it that one particular story got prepared in writing?

A. Well, the first story Mr. Bryan Lankford told was that he and his brother Mark had gone from the Houston area to Canada where Mark's car had been stolen. That they'd gone to Canada in Mark's car and it had been stolen. That didn't wash, I didn't believe it. I pointed out that Bryan's fingerprints had been found in the Bravence van, and he had to have been in it at one time or another, and he said: Okay. The second story was that: yeah, we up there, we were camping in Idaho. We didn't want to use Mark Lankford, my brother's car anymore, so I stayed in the camp, Mark left for a few hours, came back with a green van and we went on.

And I told him that wouldn't wash because his handwriting and fingerprints had been found on credit card receipts and so forth from the use of the Bravence credit card. The second time he said: Okay. I'll tell you the truth, the whole story. And that's when we started the signed that statement.

Q. And how did you go about preparing such signed statement?

A. I set out and lettered out in narrative form. I'd say; Well, what happened next.... and I'd write a sentence, and then say: What happened next.... and I just set and wrote it out. And at the end he read it and accepted my words, if you will, and signed it and wrote a little paragraph at the end of it.

Q. This document is in your longhand?

A. Yes, sir.

Q. And it bears some of his longhand?

A. Yes, sir.

Q. Did he have an opportunity to look at each page?

A. Yes, sir. He read and initialed each page and signed the last page.

Q. What happened to that original document?

A. It was presented here in court several months ago.

Q. Calling to your attention what's been marked for identification as State's Exhibit No. 76, what is that?

A. This is the signed statement we prepared on October the 7th, 1983, at Liberty County, the one that Bryan Stuart Lankford furnished to me.

Q. How many pages is it?

A. Six pages.

Q. Do you recognize each of the six pages?

A. Yes, sir. My handwriting is on each of the six pages.

Q. You indicated there were initials of Bryan Lankford on the pages, where do those appear?

A. Yes, sir. They appear at the top left where each page was started, at the bottom right where each page was ended.

Q. On the last page does there appear any handwriting of Bryan Lankford?

A. Yes, sir. On the last page Bryan's initials appear at the top left. He signs it at three quarters of the way down the page; and, then, I signed it as Larry Allen did as witnesses to the statement.

Q. Is there a discernible change in the handwriting?

A. Yes.

MR. ALBERS: Move the admission of Exhibit No. 76.

MR. LONGETEIG: No objection.

THE COURT: 76 will be marked into evidence.

(Thereupon State's Exhibit No. 76 was marked into evidence by the deputy court clerk.)

BY MR. ALBERS:

Q. Mr. Ploeger, since this is in your handwriting, could you read that for us?

A. Yes, sir: Liberty, Texas, October the 2d, 1983, I Bryan Stuart Lankford make the following free and voluntary statement to Federal Bureau of Investigation Special Agent Dennis L. Ploeger, and Liberty County, Texas Deputy Sheriff Larry Allen.

Special Agent Ploeger furnished me with a form captioned Interrogation Ad-

vice of Rights that I read, understood, and signed.

I finished the eleventh grade in school, got a GED certificate, and can read and write the English language.

Sometime in early June, 1983 Mark Lankford, my brother, came to Conroe, Texas where I was staying with my uncle, Kenneth Lankford, at 117 Lidian (phonetic) Street. I was planning to leave the area, and I called Mark to tell him I was leaving. Mark said he was going to leave the area also, so he came to Conroe from Houston, Texas, where I called him, and we left Conroe together.

We traveled in Mark's brown Chevrolet Camaro Z28, and Mark did all the driving. I had money for gas. We went through Oklahoma, Kansas, Wyoming, and possibly one or two other states before arriving in Idaho. Mark and I camped between Golden and Elk City, Idaho when we got to Idaho. We were at the camp that is off a dirt road on the side of a mountain in the woods. It was high on the mountain, and it snowed every day. After about two weeks Mark and I decided to leave the area. We had hidden Mark's car under brush near our campsite earlier. Mark wanted to leave the car because it had Texas license plates and he was afraid that he would be stopped, and he had not been making payments on the car.

We left all our personal belongings in the car except for a small bag of clothes and a twelve gauge longtom shotgun, that I carried. We left the camp and were walking down the dirt road from the camp when a white man in tan Jeep picked us up and took us to the main road. We walked towards Golden, Idaho until we came to a campsite where a green VW van was parked. Mark said there was a easier way to travel than walking, and after about an hour of discussion, we decided to steal the VW van for transportation.

Mark and I walked into the camp where the VW van was parked. A white man and white woman were in the camp. I was carrying the above mentioned shotgun, and Mark told the man to get on the ground. The man did not get on the ground, but said take the money and the van and something like don't hurt us. Mark then hit the man over the head with a night stick, like a policeman uses. He had the night stick for a long time, and carried it in his car. The woman came up from a nearby creek about that time, and Mark told her to get on the ground. She said something about her husband being hurt on the ground; and, then, she got on the ground. Mark then hit the woman over the head with the same night stick that he had hit the man on the head with. I don't remember if Mark hit the man or woman once or more than once.

He then—we then put the camping gear of the man and woman into the VW van. The man and woman had a dog, but we left the dog at the campsite. We then put the man and woman on the floor in the back of the VW van. It took both Mark and I to put them into the van. I then drove the VW van back to where Mark and I had been camped. Mark got out and took the man and woman out the side sliding door of the van and drug them off into the woods. I stayed in the van. Mark wanted to take the man and woman back to our old campsite. I am not certain, but we may have picked up some of our belongings. I don't remember any discussion about hiding the man and woman. I didn't know if the man and woman were dead when we took them to our old campsite. After that it was the middle or latter part of June, 1983 when Mark and I got the van and Mark hit them with the night stick, we went to Oregon; and, then, California in the van that belonged to the man and woman.

We used a Master Charge credit card in the name Robert Bravence, that we got from the glove box of the van, to buy gas, clothing, and at restaurants. I signed the receipts when we used the credit card, and some of the time I showed my driver's license in the name Bryan Stuart Lankford. The driver's license was in my wallet. I also signed

the traveler's checks that we got from the glove box of the van that were in the name Robert Bravence. Some of the traveler's checks had a woman's name, so we threw them away. I don't remember if I threw them away or if Mark did, but we probably threw them away somewhere in San Francisco, California because it was the first big city we went into. I don't remember the name of any specific gas station, clothing store, or restaurant where we used the credit card or the traveler's check. But we purchased food, clothing, and gas with these items.

When we got to Los Angeles, California I called Roy Ralmuto in San Antonio, Texas, and told him that Mark and I wanted to come stay with him. He sent us two bus tickets, and we went to San Antonio the last of June or early July, 1983. While I was waiting for the bus tickets Mark took the VW van, and later said he left it on the street with the keys in the can.

I have not talked to anybody about the above activity with the man and woman. I never called the Sheriff or anybody in Idaho to tell them where the man and woman were or that they may need help.

I don't remember what Mark did with the night stick after he hit the man and woman. He may have left it at the campsite of the man and woman. He may have taken it back to where we had camped earlier. Or he may have thrown it out somewhere between the two camps. I believe we left the long tom shotgun I had at the camp of the man and woman in the VW van when it was abandoned in Los Angeles, California. We probably threw the credit card away.

And in Bryan Lankford's handwriting: I have furnished this six page statement free and voluntary. No force, threats, or promises were used to influence me to make the statement. I signed below and have initialed the other five pages. Signed: Bryan Stuart Lankford. It's witnessed: Dennis L. Ploeger Special Agent FBI, Houston, Texas 10/2/83, and Larry Allen Detective Liberty County Sheriff's Office 10/2/84.

MR. ALBERS: No further questions. Tr., Vol. 3, pp. 524–32.

The "confession" as I read it is not as inculpatory as to Bryan Lankford's involvement in the robbery as his trial testimony. As to murders, it is only inculpatory as to the carrying of the shotgun by Bryan Lankford, and portrays Mark Lankford as killing Captain Bravence while he was on his feet pleading to be robbed only, and in turn killing Mrs. Bravence when she knelt to tend to her stricken husband. I do not agree with that statement being characterized as a written confession regarding the killings. A confession is generally defined as a statement acknowledging guilt of the offense charged. See Black's Law Dictionary, Fifth Ed., p. 269, where is also explained the distinction between a statement and a confession.

### III.

A major concern is caused by the majority's handling of the court's failure to give defendant's Requested Instruction No. 4, set out in the opinion at p. 694, n. 4, 747 P.2d at p. 716, n. 4, and for facility of reading repeated here:

### DEFENDANT'S REQUESTED INSTRUCTION NO. 4

. . . .

Answer this question only if you find the defendant, Bryan Lankford, guilty of Murder in the first degree.

Do you find, beyond a reasonable doubt that Bryan Lankford himself killed, attempted to kill, or had any intent to kill either of the victims in this case?

The majority turns aside the challenge on the premise, unspoken, that it is irrelevant. Says the majority, "In Idaho it is the judge and not the jury who makes the determination of whether the death sentence will be imposed." What the majority necessarily must concede, however, is that this is a close case. The district court did *not* make that finding, and so, as matters now stand, it has not been made.

The finding which was made, by a district judge fully informed as to Mark Lank-

ford's conduct, having by the time of Bryan Lankford's sentencing presided over both trials,[4] was this:

> (d) The murders were defined as murder of the first degree by Idaho Code Section 18–4003(d), and the murders were accompanied with the specific intent to cause the deaths of Mr. and Mrs. Bravence. R., p. 348.

That is not by any stretch of the imagination the equivalent of a district court finding which, if the court found from the evidence, could have been couched in this suggested language: Bryan Lankford, although he himself was not the slayer of either of the victims, had the intent that the victims would be killed. Nor is it a finding that Bryan Lankford himself killed either of the victims, or attempted to kill them.

It would seem that there was no valid reason for the trial court's refusal to give the requested instruction. At the least, the consensus of the jury, who had heard the same evidence, would be, and should be, of great moral support when the court arrived at the moment of awesome responsibility when had to be made the decision between life and death. Moreover, the defendant was placing all the marbles on the line in asking for that instruction. If the defendant was willing that the consensus of the jury might have been a *yes* answer, the court would have been spared some, if not much, of the agonizing of which District Judge Oliver lamented in *State v. Osborn, supra,* when he refused to conduct a second sentencing hearing, but instead imposed a life sentence without complying with this Court's mandate on reversal and remand.

There is no rule or principle which, even under the solicitor general's scheme for capital sentencing adopted by the legislature, nothing which forbids a district judge from getting advisory verdicts from a jury —much the same as is commonly and properly done in equity cases. And, notwithstanding how this Court has ruled, three to two, the district judges are well aware of

other times, pre-*Furman* and pre-confusion, when the court instructed the jurors on the law and to the jury fell the awesome responsibility of imposing either a death or life sentence. District judges are sworn to uphold the Idaho Constitution, and while not free to disregard a majority opinion from this Court, are free to have and express their own views. If ever before *Furman* and *Woodson* there was any public or district judge clamor in Idaho to do away with jury sentencing in capital cases, it escaped the attention of anyone I know, and my own as well.

## CONCLUSION

The extent of Bryan Lankford's participation in the actual killing will probably never be known. What is known is that he was a participant in the robbery and carried a shotgun. It can be said, too, that he watched the killings, after which he aided his brother Mark Lankford in removing the bodies. It cannot be said on this record that he is bound by the state of mind of his brother. The Supreme Court of the United States in *Tison* set the proper guideline for the sentencing of Bryan Lankford.

> A critical facet of the individualized determination of culpability is the mental state with which the defendant commits the crime. .... A narrow focus on the question of whether or not a given defendant "intended to kill," however, is a highly unsatisfactory means of definitively distinguishing the most culpable and dangerous of murderers. ... Similarly, we hold that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

As I read again that which Judge Lodge wrote in refusing to further participate in the *Windsor* and *Scroggins* cases, and on

---

**4.** It is to be kept in mind that sentencing of Bryan Lankford was deferred until after the Mark Lankford trial at which he would testify, pursuant to a grant of immunity.

rereading what I had to say in some of the other death penalty cases, it is seen that both Judge Lodge and myself are vindicated in our views on capital sentencing, and particularly culpability and intent.

I cannot believe that Beam absent Scroggins would have murdered their helpless victim. Nor can I believe that Fetterly absent Windsor would have murdered their helpless victim. Nor can I believe that Sivak absent Bainbridge would have murdered their helpless victim. Two people conspiring to commit a crime are essentially of the same temperament as a small lynch mob—doing in concert what one would not attempt alone.

In sum, I continue to agree with Justice Huntley that under the *Idaho* Constitution capital sentencing by a jury is required—a proposition weakly challenged by Justice Bakes and avoided by every other jurist in Idaho, and yet to be addressed by the solicitor general, who obviously *favors* judge sentencing—having authored the death penalty sentencing provisions adopted by the Idaho Legislature in the aftermath of *Furman* and *Woodson.* I entertain no doubt that Bryon Lankford is properly found guilty of felony murder, and that the verdict and judgment should be affirmed. Because the two Lankfords share an equal complicity in the planned robbery which culminated in two senseless murders—where there was obviously more regard for a dog than there was for human life, had the jury been given defendant's requested Instruction No. 4, or something similarly worded, and had the jury answered in the affirmative, my vote would unhesitatingly be to uphold the imposition of the death penalty. Had the jury been the sentencing authority as it is in 95% of the 50 states, my vote would be to affirm the death sentence, even though there may be here a lower "degree of participation in the crime" (*see* the rule of *Windsor, supra,* at 708–709, 747 P.2d at 730–731.) on the part of Bryon Lankford than there was on the part of M. Lankford. If the majority were to atone to Judge Lodge and to the criminal justice system for its *Windsor* and *Scroggins* opinions which destroyed all vestige of proportionality in capital sentencing cases,

I would be more amenable to a majority opinion which did not leave standing in place the ratio decedendi by which the majority left Fetterly to be executed, while sparing Windsor, and left Beam to be executed while sparing the far more culpable Scroggins. Had the trial judge recited firm evidence from which he was able to say not just that "the murders were accompanied with the specific intent to cause the deaths of Mr. and Mrs. Bravence," but that Bryan Lankford himself was possessed of that specific intent, and were not the *Tison* case seemingly standing in the way, I could vote to affirm the death penalty, reserving only the proposition that the Idaho Constitution requires that the sentencing function be performed by a jury.

An unfortunate aspect of this case, as in the murders by Sivak and Bainbridge, and as in the murder by Scroggins and Beam, is the separate trials of the two defendants. They were jointly charged, had a joint preliminary hearing, and as I remember it, were named as co-defendants in the initial information filed in district court. The record does not contain an order of severance or a motion for severance, and there appears to be no involvement of any confessions to murder which would require application of the *Bruton* rule. It would seem to me that here, as in the Sivak-Bainbridge murder, and in the Scroggins-Beam murder, and likewise the Fetterly-Windsor murder, where there were no eye-witnesses other than the defendants, a single jury would not only have been better suited to decipher the truth, but to make the assessment of the "degree of participation in the crime," and impose the penalty—which would likely be highly proportionate.